FILED

Apr 26 2018, 8:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Ruth Johnson
Deborah Markisohn
Rory Gallagher
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Scott Randall,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | April 26, 2018<br><br>Court of Appeals Case No.<br>49A02-1708-CR-1779<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Clark Rogers, Judge<br><br>Trial Court Cause No.<br>49G25-1607-F6-29473 |

**Robb, Judge.**

# Case Summary and Issues

Scott Randall brings this interlocutory appeal from the trial court's denial of his motion to suppress evidence resulting from a police officer's observations while conducting a welfare check. The trial court concluded the welfare check was supported by the community caretaking function. Randall now appeals presenting three issues which we restate as: (1) whether the trial court erroneously applied the community caretaking function; (2) whether Randall's seizure was reasonable under the Fourth Amendment to the United States Constitution and Article 1, Section 11, of the Indiana Constitution; and (3) whether Randall's statements were made in violation of *Miranda*. Concluding the trial court erroneously applied the community caretaking function but that Randall's seizure was reasonable under both the Fourth Amendment and Article 1, Section 11 pursuant to the emergency aid doctrine, and that Randall's statements were not made in violation of *Miranda*, we affirm.

# Facts and Procedural History[1]

Around 9:00 p.m. on July 29, 2016, Deputy Ashley Rose, a special deputy of the Marion County Sheriff's Office performing off-duty security work for St. Vincent's Hospital, was patrolling the same-day surgery parking lot when he

---

[1] We heard oral argument at DePauw University in Greencastle, Indiana, on April 9, 2018. We thank the faculty—especially Professor Bruce Stinebrickner—staff, and students of DePauw University for their generous hospitality and commend counsel for their skilled and informative oral advocacy.

observed a man sitting in the driver's seat of a black Ford Focus with the driver's door open and ignition off. The man, later identified as Randall, "appeared to be leaning forward over the steering wheel" or "slumped over." Transcript, Volume 1 at 10-11.

[3] Deputy Rose decided to conduct a "welfare check"[2] and proceeded to pull behind Randall's car while activating his "overhead takedown lights."[3] *Id.* at 10. As soon as Deputy Rose put his car in park, "Randall abruptly exited his vehicle and started walking toward my vehicle at a fast pace." *Id*. at 10. Deputy Rose ordered Randall back to his car and Randall obliged, returning to the driver's seat of his car. Deputy Rose then approached Randall's car and began speaking with him while the driver's door was still open. During this time, Deputy Rose observed that Randall was speaking quickly, "sweating very intensely," and that he began "reaching around the car very nervously." *Id.* at 12. Deputy Rose also observed a "folded square of aluminum foil" on the dashboard of the car, which he believed to be consistent with narcotic use. *Id.*

[4] Suspecting drugs were in the car, Deputy Rose attempted to "find out what else would be in the vehicle that would be paraphernalia or narcotics related." *Id*. at 14. Specifically, Deputy Rose told Randall that he "had experience and I asked him what else in the vehicle he would not want a canine officer to find." *Id.* at

[2] Deputy Rose later testified "[w]e've had people die in that lot . . . ." *Id.* at 17.

[3] "Overhead take down lights" are white lights for "scene lighting[,]" not flashing red-and-blue lights. *Id.* at 18.

17. Randall admitted that he had a marijuana pipe, and Deputy Rose then instructed him to exit his vehicle. After Randall refused and began raising his voice, another officer who had arrived on scene activated his taser and pointed it at Randall while Deputy Rose placed Randall's left wrist in a wrist lock.

> [Randall] began crying immediately and stated it's in the door, it's in the door. And so I had to, you know, ask him what are you talking about. And he said that there was meth in the door. And I looked to the left and clearly in plain view in the door in the pocket I could see a clear plastic baggie which had a white powdery substance in it.

*Id.* at 14-15. Randall was detained, placed in handcuffs, and seated nearby while a search of the vehicle revealed methamphetamine and two marijuana pipes. Because Deputy Rose had no further questions to ask Randall once he was in custody, he "did not feel *Miranda* was required" and therefore, Randall "was not read *Miranda* that night." *Id.* at 16.

[5] Randall was subsequently charged with possession of methamphetamine, a Level 6 felony, and two counts of possession of paraphernalia, both Class C misdemeanors. Randall moved to suppress the evidence against him and the trial court denied his motion after a hearing, concluding:

> In this case, Officer Rose approached the Defendant for the purpose of a welfare check, under his community caretaking function, which allows for a seizure of the Defendant as long as it reasonably takes to assess his wellbeing (as well as to provide aid if necessary). Based on Officer Rose's testimony, he did not have his concern for the Defendant's wellbeing alleviated by the Defendant exiting his vehicle, ordering the Defendant to return

to his vehicle for officer safety and then approaching - arguably a seizure. Additionally, there are no facts alleged to suggest that Officer Rose had any reasonable suspicion of a crime - he stated that he saw a man slumped over his steering wheel and excitedly exit his vehicle. Even if Officer Rose might have had a slight suspicion that the Defendant had taken an illegal substance to cause his incapacitated state, the objective reasoning of checking on someone who clearly looks distressed, as well as the fact that someone in an incapacitated state in a hospital parking lot could have easily been caused by numerous other reasons, more than outweighs such suspicion. More importantly, public need and interest (i.e., we want Officer Rose to check on the wellbeing of someone slumped over a steering wheel, and we do not want him to prejudge the situation because he sees the person simply exit his vehicle - assuming a person is fine seconds after being incapacitated and not possibly still suffering from the effects of whatever caused the incapacity could be tragic) significantly outweigh the minimal intrusion upon the privacy of the Defendant in this case (i.e., having to return to his vehicle and briefly talk with Officer Rose about his wellbeing).

After reviewing the totality of the circumstances, balancing the interests, and determining reasonableness, the Court finds that Officer Rose acted reasonably and was justified in ordering the Defendant to return to his vehicle and approaching the vehicle to talk with the Defendant.

Appellant's Appendix Volume II at 52.

[6] Randall filed a petition to certify the trial court's order for interlocutory appeal and for a stay of the proceedings, which the trial court granted on July 11, 2017. This court accepted jurisdiction on September 18, 2017.

# Discussion and Decision

## I. Standard of Review

[7] We review a trial court's ruling on a motion to suppress in a manner similar to other sufficiency matters. *Taylor v. State,* 69 N.E.3d 502, 505 (Ind. Ct. App. 2017).

> The record must disclose substantial evidence of probative value supporting the trial court's decision. We do not reweigh the evidence. We consider conflicting evidence most favorable to the trial court's ruling, but unlike other sufficiency matters, we must also consider undisputed evidence favorable to the defendant.

*Id*. (internal citations omitted). Where, as here, an appellant's challenge to such a ruling is premised on a claimed constitutional violation, we review the issue de novo because it raises clear questions of law. *Guilmette v. State*, 14 N.E.3d 38, 40-41 (Ind. 2014). We may affirm the trial court's ruling if it is sustainable on any legal basis in the record, even though it was not the reason that the trial court enunciated. *Scott v. State*, 883 N.E.2d 147, 152 (Ind. Ct. App. 2008).

## II. Seizure

[8] The Fourth Amendment to the United States Constitution states that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.

[9] "Accordingly, a warrantless search or seizure is per se unreasonable, and the State bears the burden to show that one of the well-delineated exceptions to the warrant requirement applies." *M.O. v. State*, 63 N.E.3d 329, 331 (Ind. 2016) (quotations omitted). "[A] person is 'seized' . . . when, by means of physical force or a show of authority, his freedom of movement is restrained." *U.S. v. Mendenhall*, 446 U.S. 544, 553 (1980). On appeal, the State concedes that Deputy Rose ordering Randall to return to his vehicle constituted a seizure. Brief of Appellee at 10. The trial court found the seizure reasonable pursuant to the community caretaking function and Randall now argues its application was erroneous. Although we agree that the community caretaking function was inapplicable on the facts presented, we nevertheless find Randall's seizure permissible under the emergency aid doctrine.

## A. Community Caretaking Function

[10] Put simply, the community caretaking function is:

> a catchall term for the wide range of responsibilities that police officers must discharge aside from their criminal enforcement activities. Indeed, besides enforcing criminal laws, police aid those in distress, combat actual hazards, prevent potential hazards . . . and provide an infinite variety of services to preserve and protect community safety.

*Wilford v. State*, 50 N.E.3d 371, 375 (Ind. 2016) (citations and quotations omitted).

[11]     In its Findings of Fact, Conclusions of Law, and Order, the trial court relied primarily on our decision in *McNeal v. State*, 62 N.E.3d 1275 (Ind. Ct. App. 2016), *vacated in relevant part* by *McNeal v. State,* 76 N.E.3d 136 (Ind. 2017). There, a panel of this court adopted a three-prong analysis "for evaluating claims of police community caretaking functions as set out by the Wisconsin Supreme Court in *State v. Kramer*, 315 Wis.3d 414, 759 N.W.2d 598, 605 (2009)." *McNeal,* 62 N.E.3d at 1281. The trial court applied the *Kramer* three-prong analysis before concluding Deputy Rose's actions were justified by the community caretaking function. Just a few weeks after the trial court's order*,* however, our supreme court issued its opinion in *McNeal v. State*, which expressly vacated the *Kramer* analysis:

> [McNeal] asks this Court to vacate a portion of the Court of Appeals' opinion discussing the community caretaking exception to the Fourth Amendment's warrant requirement.
>
> McNeal's request is well-taken. We now grant transfer, vacating the Court of Appeals' discussion of the community caretaking function . . . .

76 N.E.3d at 137.

[12]     Because our supreme court expressly vacated the *Kramer* analysis, Randall alleges the trial court's legal basis for denying his motion to suppress "cannot be upheld." Brief of Appellant at 13. We agree, and to the extent the trial court applied the community caretaking function, such application was erroneous.

[13] Our supreme court has only applied the community caretaking function as an exception to the warrant requirement in the limited context of inventory searches, and even then "only when the State meets a strict two-prong standard for proving the warrantless impoundment was reasonable." *M.O.*, 63 N.E.3d at 332 n.2 (quotation omitted). However, as noted above, we may affirm the trial court's ruling if it is sustainable on any legal basis in the record, even though it was not the reason that the trial court enunciated. *Scott*, 883 N.E.2d at 152.

## B. Emergency Aid Doctrine

### 1. Fourth Amendment

[14] Although the trial court erroneously applied the community caretaking function, its reasoning tracked another exception to the warrant requirement with a basis in the record—the emergency aid doctrine. The emergency aid doctrine is premised on the theory that police should be able to act without obtaining a warrant when they reasonably believe a person needs immediate aid or attention. *Mincey v. Arizona*, 437 U.S. 385, 392 (1978). "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Id.* (quotation omitted). Under the emergency aid doctrine, an officer may act without a warrant where the officer had "an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger." *Michigan v. Fisher*, 558 U.S. 45, 49 (2009) (quotations omitted).

[15]     Our supreme court recently explored the emergency aid doctrine through two cases decided the same day: *M.O. v. State*, and *Cruz-Salazar v. State*, 63 N.E.3d 1055 (Ind. 2016). First, in *M.O.*, the clerk of a gas station reported that a woman was "stuck underneath her vehicle in the parking lot." 63 N.E.3d at 330. By the time an officer arrived on scene, dispatch had advised the officer that the woman was leaving the gas station and the officer observed her vehicle leaving the parking lot. "[F]earing for her well-being[,]" the officer initiated a traffic stop and approached her vehicle "where he observed no signs of physical injury." *Id.* at 330-31. The officer then engaged the defendant in conversation and she explained why she had been stuck underneath her vehicle, but during this conversation the officer observed signs of impairment and smelled the odor of alcohol coming from the vehicle. The defendant was arrested, charged with operating a vehicle while intoxicated, and later moved to suppress the evidence claiming the traffic stop was invalid under both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution.

[16]     On transfer,[4] our supreme court turned to two cases that seemingly delineate the boundaries of Indiana's recognized emergency aid doctrine: *Bruce v. State,* 268 Ind. 180, 216, 375 N.E.2d 1042, 1062 (1978) (holding search of vehicle revealing a shotgun used in murder prosecution was permissible where officer

---

[4] The trial court denied the defendant's motion to suppress and the Court of Appeals reversed. *M.O. v. State*, 54 N.E.3d 428, 439 (Ind. Ct. App. 2016).

was responding to a report of an accident with injury) and *Trotter v. State*, 933 N.E.2d 572, 577 (Ind. Ct. App. 2010) (holding search was impermissible where there was no evidence that the defendant was in need of emergency assistance where police responded to gunshots on private property and were told a man had gone inside to use the bathroom and the police entered the barn to find the man). Applying the reasoning of the two cases to the facts before it, the *M.O. Court* explained:

> Officer Arnold responded to a report that a woman was trapped under her car, which undoubtedly could give rise to a reasonable concern that emergency medical assistance was needed, prompting further investigation, as in both *Bruce* and *Trotter*. However, the actual facts he subsequently confronted did not objectively support that concern: Officer Arnold learned that M.O. had freed herself prior to his arrival at the gas station, M.O. operated her vehicle normally, and Officer Arnold witnessed no traffic infractions or criminal conduct. This is distinctly different from *Bruce*, where the responding officer came upon facts consistent with a continuing emergency, and thus the officer had "no reasonable alternative" but to conduct a warrantless search of the vehicle. *Bruce*, 268 Ind. at 216-17, 375 N.E.2d at 1062. Rather, as in *Trotter*, while the evidence Officer Arnold observed firsthand, when combined with the report, may have "indicat[ed] a possible unsafe situation, such evidence does not establish an exigency sufficient to justify [the] warrantless intrusion" of stopping M.O.'s car. *Trotter*, 933 N.E.2d at 580.

> We do not believe Officer Arnold's assertion that he feared for M.O.'s medical state was merely a pretext to conduct an investigatory stop, but his subjective intent is not decisive: "[T]he test is objective, and the government must establish that the circumstances as they appear[ed] at the moment of [the stop] would lead a reasonable, experienced law enforcement officer to

believe that someone inside the [vehicle] required immediate assistance." *Trotter*, 933 N.E.2d at 579. And in a close case on these unique facts, we err, if at all, on protecting the privacy rights of Hoosiers against intrusion by the State. Accordingly, we find that the State has failed to carry its burden of showing that an exception to the warrant requirement of the Fourth Amendment justified the stop.

*Id.* at 333-34.

[17] In *Cruz-Salazar v. State*, an officer responded to a report of a suspicious vehicle which had been parked in front of a residence for thirty minutes while still running. 63 N.E.3d at 1055. The officer found the vehicle as described and shined his spot light on the vehicle to find the defendant "sleeping or passed out." *Id.* After the defendant failed to respond to knocks on the window, the officer opened the vehicle's door and awoke the defendant by "shaking him a little." *Id.* at 1056. The officer then immediately observed behavior consistent with intoxication and arrested the defendant for public intoxication. A subsequent search incident to arrest revealed cocaine on his person. The trial court denied the defendant's motion to suppress and he was convicted following a bench trial. On transfer, our supreme court cited its discussion of the emergency aid exception in *M.O.*, and proceeded directly to its application:

> Police received a report of a stationary vehicle that had been running for 30 minutes, in the early hours of a cold December morning. This alone is sufficiently unusual to merit further investigation, as it could be an indicator of distress. Police arrived on scene to find the situation as reported, and indeed worse: Cruz–Salazar was at the wheel of the vehicle, and was not responsive when Officer Ayler both shined his flashlight through

the windows or when he tapped on the window. At this point, the officer had an objectively reasonable basis to open the door and check on Cruz–Salazar's well-being. Accordingly, we find the warrantless entry into Cruz-Salazar's vehicle permissible under the Fourth Amendment to the Federal Constitution and Article 1, Section 11 of the Indiana Constitution.

*Id.* at 1056-57 (citation omitted).

[18] Returning to the facts presented here, while patrolling a hospital parking lot where he testified that people have died, Deputy Rose observed a man appearing to be "slumped over" the steering wheel of his car with his driver's door open. Tr., Vol. 1 at 11. We believe these observations "could give rise to a reasonable concern that emergency medical assistance was needed, prompting further investigation . . . ." *M.O.,* 63 N.E.3d at 333. Therefore, we conclude that Deputy Rose had an objectively reasonable basis to believe that Randall required medical assistance when he initially observed his vehicle.

[19] As Deputy Rose activated his overhead white lights and pulled behind Randall to conduct a welfare check, Randall "abruptly exited his vehicle and started walking toward [Deputy Rose's] vehicle at a fast pace." Tr., Vol. 1 at 10. Deputy Rose then ordered Randall to return to his vehicle and he obliged, but Randall argues that at this point in the encounter, although the facts may have initially supported application of the emergency aid exception, "any such concern dissipated once [he] promptly became alert and got out of his car without incident." Br. of Appellant at 16. In so arguing, Randall relies on the facts of *M.O.,* where, as discussed above, our supreme court concluded the facts

did not support an exigency sufficient to justify the warrantless intrusion of stopping M.O.'s car. *M.O.*, 63 N.E.3d at 333. Concluding the facts that Deputy Rose confronted objectively supported his concern and constituted an exigency sufficient to justify Randall's brief seizure, we find *Cruz-Salazar* controlling and *M.O.* distinguishable.

[20] We disagree that Randall's behavior immediately dispelled Deputy Rose's concern. The trial court found that "[b]ased on Officer Rose's testimony, he did not have his concern for [Randall's] wellbeing alleviated by [Randall] exiting his vehicle . . . ." Appellant's App., Vol. II at 52. On appeal, Randall alleges that the trial court's finding is unsupported by the record because "there is no testimony that Deputy Rose remained concerned for Randall's well-being after Randall became alert and approached [Deputy Rose's vehicle]." Br. of Appellant at 19. Instead, Randall points to Deputy Rose's testimony that he "ordered him back to his vehicle . . . for concerns of officer safety," tr., vol. 1 at 10, and the facts that Deputy Rose never asked about Randall's well-being or inquired as to whether he required medical attention as evidencing that Randall's detention was unrelated to any ongoing emergency.

[21] Having concluded there was an objectively reasonable basis to believe Randall initially required medical assistance, we also conclude that his subsequent behavior—quickly becoming alert, exiting his vehicle, and approaching Deputy Rose's vehicle at a fast pace—objectively supported that concern, even if that same behavior dispelled any suspicion that Randall was dead or unconscious.

*See Fisher,* 558 U.S. at 49 (noting that "Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception.").

[22]  Moreover, we do not view Deputy Rose ordering Randall to return to his vehicle for "concerns of officer safety," tr., vol. 1 at 10, as necessarily negating his concern for Randell's well-being.  Concerns of officer safety and the emergency aid exception are not mutually exclusive.  *See Jones v. State,* 54 N.E.3d 1033, 1039 (Ind. Ct. App. 2016) (holding a protective sweep under emergency aid exception was permissible where it was conducted before the underlying concern of the emergency aid exception was dissipated).  And, unlike the traffic stop in *M.O.*, conducted *after* the vehicle safely left the gas station and *after* the officer observed M.O. safely operating her vehicle, the facts that Deputy Rose confronted were uncertain and rapidly evolving: Randall was suddenly alert and approaching Deputy Rose's vehicle at a "fast pace" just moments after appearing "slumped over" his steering wheel.  Tr., Vol. 1 at 10.  Therefore, mindful of our deference to the trial court's determination of facts, we cannot say that Deputy Rose's concern for Randall's safety dissipated immediately after Randall exited his vehicle.  Because Deputy Rose possessed an objectively reasonable concern for Randall's safety, we conclude Randall's brief seizure was permissible under the emergency aid exception.

### 2. Article 1, Section 11

[23]  Randall also argues that his seizure was unreasonable under Article 1, Section 11 of the Indiana Constitution.

[24] Although Article 1, Section 11 shares the same language as the Fourth Amendment, we nevertheless interpret and apply the provision independently. *State v. Bulington*, 802 N.E.2d 435, 438 (Ind. 2004). Notably, instead of "focusing on the defendant's reasonable expectation of privacy, we focus on the actions of the police officer, and employ a totality-of-the-circumstances test to evaluate the reasonableness of the officer's actions." *Duran v. State*, 930 N.E.2d 10, 17 (Ind. 2010) (internal quotations omitted). We give Article 1, Section 11 "a liberal construction in favor of protecting individuals from unreasonable intrusions on privacy." *Rush v. State*, 881 N.E.2d 46, 52 (Ind. Ct. App. 2008). Further, it is the State's burden to prove its intrusion was reasonable under the circumstances. *Bulington*, 802 N.E.2d at 438. To determine reasonableness, we consider: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005).

[25] Beginning with the first factor, Randall argues that suspicion a violation occurred was "nonexistent." Br. of Appellant at 22. While true, the State raises an interesting issue in that the *Litchfield* opinion was written in the criminal context and notes that our supreme court has never specifically addressed how to apply the first *Litchfield* factor outside a criminal investigation. Br. of Appellee at 20. Indeed, although our supreme court mentioned the *Litchfield* factors in *M.O.*, the court never expressly addressed them but rather simply explained that, "Given that our extensive Fourth Amendment analysis .

. . also discusses these factors, we see no need to repeat that discussion here," before concluding that the traffic stop was also impermissible under the Indiana Constitution. *M.O.*, 63 N.E. at 334. As discussed in more detail above, however, the Court addressed the officer's concern for M.O.'s safety in the context of the Fourth Amendment and explained that while the concern was reasonable when responding to a report of a woman stuck under her car—the "actual facts" he confronted "did not objectively support that concern." *Id.* Conversely, in *Cruz-Salazar*, the supreme court found that opening the door of a vehicle was reasonable where it had been running for thirty minutes and its occupant was unresponsive to police attempts to awake him. 63 N.E.3d at 1056-57.

[26] The combination of the two cases suggests that the "the degree of concern, suspicion, or knowledge that a violation has occurred," *Litchfield*, 824 N.E.2d at 361, can be read in the context of the emergency aid exception as "the degree of concern that emergency medical assistance was needed," *M.O.*, 63 N.E.3d at 333. As noted above, Deputy Rose's initial degree of concern was high—he encountered a man slumped over a steering wheel with his door open in a hospital parking lot where people had previously died. Tr., Vol. 1 at 11. Although that concern may have lowered when Randall exited his vehicle, his objectively reasonable concern remained.

[27] The second factor is "the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities." *Litchfield*, 824 N.E.2d at 361. Deputy Rose ordered Randall to return to his vehicle before approaching the

driver's side and speaking with him through his driver's door. Although the State admits that Randall was seized for the purposes of the Fourth Amendment, the degree of intrusion was low because Deputy Rose simply directed Randall to return to his own vehicle—the place where he had been just moments before. *Compare State v. Cunningham,* 26 N.E.3d 21, 26 (Ind. 2015) (noting that ordering an occupant to remain in the car is a "lesser" intrusion) *with Trotter,* 933 N.E.2d at 582 (noting the degree of officer's intrusion was "immense" where officers entered a structure attached to private residence).

[28] Finally, despite the extent of law enforcement needs being relatively low, we conclude that the balancing of a high concern and minimal intrusion weighs in favor of Randall's brief seizure. Accordingly, we conclude the seizure was permissible under Article 1, Section 11 of the Indiana Constitution.

## III. *Miranda*

[29] Next, Randall argues his incriminating statements were made in violation of *Miranda* and that the evidence resulting therefrom was fruit of the poisonous tree. The State responds that Randall was not in custody for the purposes of *Miranda.* We agree with the State and conclude that Randall's seizure was no more custodial than a routine traffic stop.

[30] Here, after observing Randall's various behaviors and a small piece of folded aluminum foil that Deputy Rose believed to be consistent with narcotic use, Deputy Rose told Randall that he "had experience" and asked him "what else [was] in the vehicle he would not want a canine officer to find." Tr., Vol. 1 at

17. In response, Randall confessed to having a marijuana pipe and Deputy Rose ordered Randall out of his vehicle in order to conduct a search. When Randall failed to comply, Deputy Rose placed him in a wrist lock and another officer aimed a taser at him. Deputy Rose then testified:

> [Randall] began crying immediately and stated it's in the door, it's in the door. And so I had to, you know, ask him what are you talking about. And he said that there was meth in the door. And I looked to the left and clearly in plain view in the door in the pocket I could see a clear plastic baggie which had a white powdery substance in it.

Tr., Vol. 1 at 14-15.

[31] "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Prior to any custodial interrogation, "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* Statements elicited in violation of *Miranda* generally are inadmissible in a criminal trial. *Loving v. State*, 647 N.E.2d 1123, 1125 (Ind. 1995). The triggering requirement for a *Miranda* warning is "custodial interrogation." *State v. Brown,* 70 N.E.3d 331, 335 (Ind. 2017).

[32] "'Interrogation' for the purposes of *Miranda* constitutes questions, words, or actions that the officer knows or should know are reasonably likely to elicit an

incriminating response." *Id.* Undoubtedly, Deputy Rose knew his question, asking Randall "what else [was] in the vehicle he would not want a canine officer to find," was likely to elicit an incriminating response. Tr., Vol. 1 at 17. Therefore, this issue turns on whether Randall was in custody at the time of Deputy Rose's questioning.

[33] Randall argues that he was in custody for the purposes of *Miranda* because "no reasonable person in his shoes would have felt free to terminate the questioning and leave the parking lot." Br. of Appellant at 28. Although that indeed may be true, Randall's argument confuses a seizure under the Fourth Amendment with custody under the Fifth Amendment. Our supreme court recently explained this issue in *Brown*:

> to the extent that Brown is arguing that a seizure under the Fourth Amendment is akin to custody under the Fifth Amendment, the U.S. Supreme Court has made clear that this is not the case. *The test of whether a defendant is in custody is not whether a defendant feels free to go, but rather whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.* Further, the United States Supreme Court has repeatedly held that a person temporarily detained in an ordinary traffic stop is not in custody for the purposes of *Miranda*. In *Berkemer* [*v. McCarty*, 468 U.S. 420 (1984)], the U.S. Supreme Court made clear that a traffic stop "significantly curtails the 'freedom of action' of the driver" and that "[c]ertainly few motorists would feel free to disobey a direction to pull over or leave the scene of a traffic stop without being told they might do so." *Berkemer*, 468 U.S. at 436-37. Thus, it concluded that a traffic stop is a "seizure" within the meaning of the Fourth Amendment. Nevertheless, the Court declined to find that this seizure was custody for Miranda purposes. *Id*. at 437. Our

> Court has similarly held that a suspect who was stopped and "seized" for purposes of the Fourth Amendment is not ordinarily in custody. *Meredith v. State*, 906 N.E.2d 867, 873-74 (Ind. 2009).

70 N.E.3d at 335-36 (emphasis added) (some citations and quotations omitted).

[34] Although Randall's seizure was initiated by the emergency aid exception, it quickly evolved into a criminal investigation. *See Cruz-Salazar*, 63 N.E.3d at 1056 (emergency aid exception evolving into criminal investigation); *State v. Gray,* 997 N.E.2d 1147, 1152 (Ind. Ct. App. 2013) ("Once a justifiable stop is made, the scope of the officer's investigation may be broadened beyond the purpose for which the person was stopped only if additional particularized and objective suspicions come to light."), *trans. denied.* Thus, for purposes of *Miranda*, we find no meaningful distinction between this encounter and a traffic stop—or a *Terry* stop, for that matter. In *Berkemer*, the United States Supreme Court noted two reasons why those two types of encounters do not trigger *Miranda*. First, it emphasized the temporary and brief nature of the stop: "questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek." *Berkemer* at 438. Second, it noted the public nature of the stop: "[t]he atmosphere surrounding an ordinary traffic stop is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda* . . . ." *Id*. at 438-39.

Both reasons apply to the facts presented here. The record reveals that Deputy Rose only asked one question before Randall admitted to the possession of paraphernalia and the seizure occurred in a public hospital parking lot. *See Brown*, 70 N.E.3d at 336-37 (concluding an Arby's parking lot was "at least as public as a routine traffic stop"). Although Randall argues Deputy Rose engaged in subterfuge by mentioning a police canine, we conclude his seizure was no more custodial than a routine traffic stop.

# Conclusion

Despite the trial court erroneously applying the community caretaking function, its ruling was sustainable on the emergency aid exception. We therefore conclude that Randall's seizure was reasonable and his statements were not made in violation of *Miranda*. Accordingly, we affirm the trial court's denial of Randall's motion to suppress.

Affirmed.

Crone, J., and Altice, J., concur.