

**FILED**

Mar 30 2020, 10:49 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kelly Starling
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Josiah Swinney
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Payton Bell,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

March 30, 2020

Court of Appeals Case No.
19A-CR-2354

Appeal from the Marion Superior
Court

The Honorable Barbara Crawford,
Judge

The Honorable Amy Barbar,
Magistrate

Trial Court Cause No.
49G01-1905-F5-20711

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Payton Bell (Bell), appeals his conviction for carrying a handgun without a license having a previous felony conviction within fifteen years, a Level 5 felony, Ind. Code §§ 35-47-2-1(a), (e)(2).

We affirm.

# ISSUES

Bell presents this court with three issues, which we consolidate and restate as the following two:

> (1) Whether his seizure and frisk of his person complied with the Fourth Amendment; and

> (2) Whether his seizure and frisk of his person was reasonable under Article 1, Section 11 of the Indiana Constitution.

# FACTS AND PROCEDURAL HISTORY

The Indianapolis Motor Speedway (IMS) owns the Coke Lot (the Lot), which is an open parking area next to the track facility where thousands of Indianapolis 500 attendees may park their recreational vehicles, camp, and socialize during the race weekend. The IMS has a "no-weapons" policy for the Lot. Anyone entering the Lot is provided a written copy of the Lot rules and policies.

On May 29, 2019, Deputy Darrius Austin (Deputy Austin) and Deputy Joshua Tyler (Deputy Tyler) of the Marion County Sheriff's Office were on-duty in

uniform at the Lot during the Indianapolis 500 weekend. Their duty that day was to enforce the Lot rules and policies. Up to 100,000 people were present on the Lot that day. The deputies were approached by two people who said they had driven to the Lot with Bell and that he had a handgun they thought might be stolen in his back pocket, which made them feel unsafe. They provided a description of Bell as a white male of average height and build with a tattoo near his right eye, and they told the deputies that they could find Bell in a certain portion of the Lot by a camper with a flag.

[6] The deputies rode to the indicated portion of the Lot in a Kubota UTV, which is similar to a golf cart but more solid. They located a man fitting the description given, later determined to be Bell. The deputies hailed Bell and asked him to approach so they could speak, which Bell did, although he seemed hesitant and reluctant. Bell stopped his approach where he would be out of the deputies' reach. The deputies told Bell that they had a report of a possible weapon in the area and reminded Bell that there was a "no-weapons" policy on the Lot. The deputies explained to Bell that if he had a firearm, they would "run it." (Transcript p. 25). If there were no issues with the firearm, they would allow him to stow it in his vehicle off the Lot.

[7] The deputies asked Bell if he had a weapon, which he denied. Bell then became irate, began shaking nervously, cursed at the deputies, and stated that they needed a warrant to speak to him. Bell took a few backwards steps away from the deputies. The deputies told Bell to calm down and to "stand still, stop[.]" (Tr. p. 34). Bell did not calm down and continued to move away from the

deputies, changing his direction as the deputies changed theirs. By that time, another deputy, Deputy Steven Hall (Deputy Hall), had situated himself behind Bell. Bell turned his body slightly to the right, assuming a fighting stance. As he did this, Deputy Hall observed the butt of a handgun poking out of Bell's back pocket. At the same moment, Deputy Hall saw Bell's hand coming down. Deputy Hall yelled that Bell had a gun and grabbed Bell's arm. The other deputies also secured Bell, who was then placed in handcuffs and transported across the Lot.

[8] Subsequent investigation revealed that Bell did not possess a permit to carry the handgun. On May 29, 2019, the State filed an Information, charging Bell with Class A misdemeanor carrying a handgun without a license. The State also alleged that the charge should be elevated to a Level 5 felony due to Bell having a prior felony conviction within the last fifteen years.

[9] On August 20, 2019, the trial court held Bell's bench trial. Bell moved to suppress any evidence obtained from his interaction with the deputies on May 29, 2019, arguing that the deputies did not have reasonable suspicion to stop him when they initially asked to approach so that they could speak. The trial court denied the suppression motion, ruling that the initial encounter between the deputies and Bell was consensual, Bell had escalated the situation with his behavior, Bell was not seized until Deputy Hall grabbed Bell's arm, and that Bell was subsequently frisked, not searched. The trial court granted Bell's request to incorporate the evidence from the suppression hearing into the trial proceedings and admitted the challenged evidence over Bell's objections.

During his suppression argument in response to a question by the trial court regarding the extent that police may enforce the rules and policies of private property owners, Bell's counsel argued as follows:

> That's what we have here. It's a private organization, [Bell]'s a paying member, he's there legally. At most he's violating their policy and at most is to [sic] kick him off their property but police can't use a no firearms policy to circumvent the Indiana and United States Constitution[s] and detain somebody until they can prove there was no wrong doing.

(Tr. p. 45).

[10] The trial court found Bell guilty of carrying a handgun without a license. Bell then admitted that he had a prior felony conviction for forgery in 2017. On September 7, 2019, the trial court sentenced Bell to three years, with one year executed with the Department of Correction, one year served with Community Corrections on work release, and one year suspended.

[11] Bell now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

[12] As a general matter, we review a trial court's decision to admit evidence for an abuse of discretion. *Price v. State*, 765 N.E.2d 1245, 1248 (Ind. 2002). However, when a defendant's challenge to the admissibility of evidence implicates the constitutionality of a search or seizure, we review the issue *de novo* because it raises questions of law. *Guilmette v. State*, 14 N.E.3d 38, 40-41

(Ind. 2014). Regardless, we do not reweigh the evidence. *Campos v. State*, 885 N.E.2d 590, 596 (Ind. 2008). We also construe conflicting evidence in the light most favorable to the trial court's suppression ruling. *Marshall v. State*, 117 N.E.3d 1254, 1258 (Ind. 2019). In addition, we will consider any substantial and uncontested evidence that supports the defendant's position. *Id*.

## II. *Fourth Amendment*

[13] The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures" and generally prohibits searches and seizures without a warrant supported by probable cause. U.S. Const. amend. IV; *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013). As a result, evidence obtained without a warrant is generally inadmissible unless it falls within one of few well-delineated exceptions. *Id*. The State has the burden to show that one of these well-delineated exceptions was met. *Id*.

## A. *Consensual Encounter*

[14] This court has summarized the three levels of police investigations as follows:

> First, the Fourth Amendment requires that an arrest or detention for more than a short period be justified by probable cause. Probable cause to arrest exists where the facts and circumstances within the knowledge of the officers are sufficient to warrant a belief by a person of reasonable caution that an offense has been committed and that the person to be arrested has committed it. Second, it is well-settled Fourth Amendment jurisprudence that police may, without a warrant or probable cause, briefly detain an individual for investigatory purposes if, based on specific and articulable facts, the officer has a reasonable suspicion that

criminal activity may be afoot. Accordingly, limited
investigatory stops and seizures on the street involving a brief
question or two and a possible frisk for weapons can be justified
by mere reasonable suspicion. Finally, the third level of
investigation occurs when a law enforcement officer makes a
casual and brief inquiry of a citizen which involves neither an
arrest nor a stop. In this type of consensual encounter no Fourth
Amendment interest is implicated.

*Overstreet v. State*, 724 N.E.2d 661, 663 (Ind. Ct. App. 2000) (citations and quotation omitted), *trans. denied*. Whether a citizen has been detained for purposes of the Fourth Amendment turns on a determination of whether, considering all the circumstances, a reasonable person would feel free to disregard the police and go about his or her business. *Negash v. State*, 113 N.E.3d 1281, 1288 (Ind. Ct. App. 2018). "Examples of circumstances under which a reasonable person would believe he was not free to leave include: (1) the threatening presence of several officers, (2) the display of a weapon by an officer, (3) physical touching of the person, or (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id*.

[15] Bell's counsel argued at trial that the deputies had the right to remove Bell from the Lot for having a gun in contravention of IMS policy, an argument which pre-supposes they had the right to approach him and ask him whether he had a gun. In an apparent concession that the initial encounter between him and the deputies was reasonable, Bell does not address the initial encounter but argues that he was subject to an investigatory stop when deputies told him to "stand

still, stop" which occurred after the deputies had asked Bell to approach them and after he had begun answering their questions. (Tr. p. 34). Bell also contends that the deputies lacked reasonable suspicion to support such a stop. The State counters that Bell was not seized until Deputy Hall grabbed Bell's hand and that the deputies had reasonable suspicion of criminal activity at that time.

[16] We conclude that the initial encounter was consensual. Only two deputies initially approached Bell, not several. Although they were in uniform, the deputies did not swoop in on Bell in their cruiser with its lights activated. There is no evidence in the record that the Kubota UTV they drove was even demarcated as a police vehicle. The deputies did not draw or display their weapons; they did not touch Bell; they did not yell at Bell, but, rather, spoke to him in a calm and polite manner. In light of the totality of these circumstances, we conclude that Bell was not seized and subjected to an investigatory stop when the deputies initially approached him. *See id*.

### B. *Investigatory Stop and Frisk for Weapons*

[17] We also conclude that, after this initial consensual encounter, reasonable suspicion developed to support an investigatory stop and a frisk for weapons. Contrary to Bell's assertion, he was not seized and subjected to an investigatory stop when the deputies told him to "stand still, stop" after he had taken a few steps backwards away from them. (Tr. p. 34). A "seizure" does not occur until, through physical force or a show of authority, an officer has actually restrained the liberty of an individual. *Terry v. Ohio*, 392 U.S. 1, 20 n.6, 88 S.Ct.

1868, 1879 n.16, 20 L.E.2d 889 (1968). The Supreme Court has also held that no seizure occurred for Fourth Amendment purposes where a subject continued to flee after being commanded by officers to "Stop, in the name of the law!" *See California v. Hodari D.*, 499 U.S. 621, 624-26, 111 S.Ct. 1547, 1550, 113 L.E.2d 690 (1991).

[18] Here, Bell stepped away from the deputies, and they told him to stand still and stop. The deputies did not touch Bell, draw their firearms, or use an aggressive tone of voice with Bell as they attempted to de-escalate the situation. After being told to stand still and stop, Bell failed to comply with that directive and continued to evade the deputies by moving in the opposite direction of whatever direction they moved. Thus, Bell's liberty was not constrained until Deputy Hall grabbed Bell's arm.

[19] However, even if the deputies' directive to stand still and stop had amounted to a seizure, it was supported by reasonable suspicion. In assessing whether a stop was justified by particularized reasonable suspicion, we consider the totality of the circumstances, including the defendant's conduct. *Glasgow v. State*, 99 N.E.3d 251, 257 (Ind. Ct. App. 2018). We will conclude that reasonable suspicion existed if the facts known to the officer, together with any reasonable inferences, would cause a person of ordinary prudence to believe that criminal activity has or is about to occur. *Campos*, 885 N.E.2d at 597. We also take into account "the nature of the suspected offense when assessing reasonable suspicion" and we have "'required less evidence when the stop is to intercept a man suspected of being armed with a gun.'" *W.H. v. State*, 928 N.E.2d 288, 295

(Ind. Ct. App. 2010) (quoting 4 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9.5(c) n.96), *trans. denied*. In addition, "[o]fficers are not required to rule out all possibility of innocent behavior before initiating a stop." *Id*. at 294.

[20] Here, during the initial consensual encounter, the deputies reminded Bell that there was a "no-weapons" rule on the Lot, and Bell denied having a weapon. They also explained to Bell that if he had a firearm, they would "run it" and, if there were no issues with the firearm, it would be returned to him so that he could take it off the Lot. (Tr. p. 25). Bell again denied having a weapon, but he also became aggressive, cursed the deputies, began shaking nervously, and took a few backwards steps away from the deputies, causing the deputies to tell him to "stand still, stop[.]" (Tr. p. 34). Thus, immediately after being told that if he possessed a gun legally, he would be allowed to leave the Lot with it, Bell became aggressive and evasive with the deputies. Given that we do not require as much evidence to support the stop of someone suspected of being armed with a firearm and given the context of the location of the stop amid thousands of people, we conclude that the totality of the circumstances gave rise to reasonable suspicion that Bell possessed a firearm and that his possession of the firearm was not legal.

[21] In addition, Bell's subsequent actions further justified a frisk of Bell for weapons. During an investigatory stop supported by reasonable suspicion, an officer may undertake a limited frisk for weapons if he has a reasonable belief that "he is dealing with an armed and dangerous individual, regardless of

whether he has probable cause to arrest the individual for a crime." *Terry*, 392 U.S. at 27, 88 S.Ct. at 1868. In *Redfield v. State*, 78 N.E.3d 1104, 1107-08 (Ind. Ct. App. 2017), *trans. denied*, this court found that an officer had such reasonable suspicion. The officer responded to an anonymous tip that a black male, who was wearing a grey shirt and a hat, had a gun at a bar. *Id*. at 1105. Outside the bar the officer spotted Redfield, who fit the description provided in the tip. *Id*. The officer told Redfield that there was a report of somebody with a gun there. *Id*. Redfield became nervous, started to walk away from the officer, and moved the right side of his body away from the officer's line of sight. *Id*. When he was five feet away from the officer, Redfield made a motion with his hand several times as if he were drawing a gun. *Id*. at 1105-06. The officer drew his gun and commanded Redfield to stop and show his hands. *Id*. at 1106. Redfield fled but was subsequently detained, and a firearm was found on his person. *Id*.

[22]  Redfield was charged with unlawful possession of a firearm by a serious violent felon and argued that evidence from the stop should be suppressed because the officer's initial encounter was not supported by reasonable suspicion. *Id*. at 1106-07. In upholding the trial court's denial of Redfield's suppression motion, the court found that the officer's initial encounter with Redfield was consensual and that "[i]t is settled law that, if an officer has commenced a nonseizure confrontation without a pre-existing reasonable suspicion supporting a frisk, but such suspicion suddenly appears (most likely because of the suspect's conduct), then the officer is entitled to frisk for his own protection." *Id*. at 1107

(quotation omitted). The court found that the officer had reasonable suspicion to seize Redfield and frisk him because Redfield, after hearing that there had been a report of a person with a firearm, became nervous, had turned his body away from the officer, and made a motion consistent with drawing a firearm. *Id*. at 1108.

[23] Here, after learning that the deputies had received a report that he was carrying a firearm but that he would be allowed to leave the Lot if he were legally carrying it, Bell became nervous and aggressive. Bell also began moving away from the deputies. As the other two deputies were interacting with Bell, Deputy Hall positioned himself behind Bell. Bell eventually turned his body away from the other two deputies and assumed a fighting stance, giving Deputy Hall a plain view of the gun in Bell's pocket. Deputy Hall testified that he then saw Bell's hand "coming down," which we infer from the circumstances was a movement toward the gun. (Tr. p. 32). Following *Redfield*, we conclude that these circumstances gave rise to a reasonable suspicion supporting a frisk of Bell's person for weapons. *See id*.

### C. *Bell's Arguments*

[24] Bell argues that the tip received from the two people who had ridden to the Lot with him was not sufficiently reliable to support an investigatory stop. However, for purposes of our analysis we have assumed, without deciding, that the tip was insufficient to supply reasonable suspicion to support an investigatory stop. We have also concluded that the deputies' initial encounter with Bell was consensual, a type of contact between law enforcement and

citizen that requires no level of suspicion to justify. *See, e.g.*, *State v. Augustine*, 851 N.E.2d 1022, 1025-26 (Ind. Ct. App. 2006) (observing that the officer's approach to the defendant was a consensual encounter which did not implicate the Fourth Amendment). Following that initial encounter, we have concluded that Bell's own conduct, not the tip, provided reasonable suspicion for an investigatory stop and frisk.

[25] Bell also likens his case to *Pinner v. State*, 74 N.E.3d 226, 230 (Ind. 2017), in which our supreme court held that a suspect's mere possession of a firearm, without more, cannot provide reasonable suspicion for an investigatory stop. In *Pinner*, law enforcement seized Pinner based on a report that a man at a theater had a gun and Pinner's hesitant and nervousness reaction when told of the report and asked if he had a gun. *Id*. at 228. Our supreme court held that no reasonable suspicion existed for the seizure because the report had not indicated any criminal or suspicious behavior, Pinner made no furtive or suspicious movements, did not reach for the gun, and did not attempt to flee. *Id*. at 229-30. However, we find *Pinner* to be distinguishable because, here, the deputies did more than tell Bell there had been a report of a gun and ask him if he had one. They also told Bell that if he had a gun and possessed it legally, he would be allowed to leave the Lot with it. Bell reacted by attempting to evade the deputies, turning his body away from them, assuming a fighting stance, and moving his hand toward a gun which was plainly visible in his back pocket. Accordingly, there was much more giving rise to a reasonable suspicion that Bell illegally possessed a firearm than his mere possession.

[26] Bell also briefly argues that no probable cause supported his arrest. His only contention in this regard is that, since there was no reasonable suspicion that he was engaged in criminal activity to support a stop, there could be no probable cause because probable cause is a higher standard to meet. As we have concluded that reasonable suspicion existed to support an investigatory stop and frisk for weapons, and this is the only argument Bell offers, we do not address the issue further.

### III.  *Article 1, Section 11*

[27] Bell contends that his state constitutional rights were violated by the deputies when they seized him. Bell also briefly argues that his state rights were infringed by his arrest, but our review of the record of the trial proceedings revealed that Bell addressed his arguments only to the initial encounter and seizure, with nothing argued regarding his arrest. Therefore, we only address whether the deputies' conduct up to the moment when he was seized by Deputy Hall was within constitutional parameters. *See Leonard v. State*, 80 N.E.3d 878, 884 n.4 (Ind. 2017) (finding issue raised for the first time on appeal to be waived, as declining to review an unpreserved issue is a cardinal principle of sound judicial administration).

[28] Article 1, Section 11 of the Indiana Constitution, like the Fourth Amendment, protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search and seizure[.]" However, although Article 1, Section 11 and the Fourth Amendment share similar language and protect similar interests, we interpret our state constitutional provision

independently. *Randall v. State*, 101 N.E.3d 831, 841 (Ind. Ct. App. 2018), *trans. denied*. Rather than focusing on the defendant's reasonable privacy expectations, we look at the actions of the officer and the totality of the circumstances to evaluation the reasonableness of the officer's actions. *Id.* As part of the examination of the totality of the circumstances, we consider: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005).

[29] Here, although the deputies may have initially had a low degree of concern, suspicion, or knowledge that a violation had occurred when they approached Bell, he became irate and physically evasive after being told that if he had a firearm legally, he would be able to leave the Lot with it. This conduct provided at least a moderate degree of suspicion that Bell illegally possessed a firearm. Then, after being told to stand still and stop, Bell continued to attempt to evade the deputies, turned his body away from them, assumed a fighting stance, and reached for the gun that had become visible to Deputy Hall, giving rise to a high degree of suspicion that he illegally possessed a firearm.

[30] The degree of intrusion is assessed from the defendant's point of view. *Duran v. State*, 930 N.E.2d 10, 18 (Ind. 2010). At the beginning of the encounter, the degree of intrusion was low because the deputies simply asked Bell to come speak to them which entailed walking a short distance. Bell was not pleased and testified at the suppression hearing that he felt like he was obligated to

comply, but he intentionally chose to stand in a spot that was out of the deputies' reach, thus demonstrating he still felt a degree of liberty. After Bell was told that if he legally possessed a firearm he could leave the Lot with it and Bell reacting by being physically evasive, cursing, and assuming a fighting stance, all of which ultimately revealed the firearm in his pocket, the degree of intrusion became high, as Deputy Hall and then other deputies physically restrained him.

[31]     Although the degree of suspicion and the degree of intrusion are both high in this case, we conclude that the extent of the needs of law enforcement tips the balance in favor of reasonableness. As Bell acknowledges on appeal, the "protection of the public is a legitimate and important law enforcement function." *Carpenter v. State*, 18 N.E.3d 998, 1002 (Ind. 2014). And, as the State brings to our attention, this court has recognized that "[p]rotecting the public from gun violence is a legitimate and paramount concern of law enforcement, and the State is legitimately concerned with deterring gun violence by unlicensed individuals." *Grayson v. State*, 52 N.E.3d 24, 28 (Ind. Ct. App. 2016), *trans. denied*. While initially their need was low when the deputies encountered Bell, the need of the deputies to protect the large crowd present on the Lot, as well as themselves, from potentially being shot by Bell became great when Bell assumed a fighting stance against the deputies and made a movement for his plainly-visible gun. Accordingly, we conclude that the deputies did not infringe upon Bell's state constitutional rights when they seized him and frisked him for weapons.

# CONCLUSION

[32] Based on the foregoing, we conclude that neither Bell's Fourth Amendment nor his Article 1, Section 11 rights were infringed upon when his own conduct led to the deputies' reasonable actions.

[33] Affirmed.

[34] Mathias, J. and Tavitas, J. concur