ATTORNEYS FOR APPELLANT
Ruth Ann Johnson
Marion County Public Defender Agency

Michael R. Fisher
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Henry Albert Flores, Jr.
Deputy Attorney General

Caryn Nieman-Szyper
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court



FILED

May 09 2017, 2:43 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

No. 49S02-1611-CR-610

THOMAS PINNER,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellees (Plaintiff below).*

Appeal from the Marion Superior Court, No. 49G20-1503-F5-8548
The Honorable Peggy Hart, Commissioner
The Honorable Shatrese Marie Flowers, Judge

On Petition To Transfer from the Indiana Court of Appeals, No. 49A02-1511-CR-2036

**May 9, 2017**

**Rucker, Justice.**

Charged with possession of a firearm Defendant moved to suppress the evidence on both federal and state constitutional grounds. The trial court denied the motion. After de novo review, we reverse the judgment of the trial court.

**Facts and Procedural History**

On February 20, 2015, patrol officers with the Indianapolis Metropolitan Police Department received a dispatch advising "there was a couple in a taxi cab. And upon exiting the taxi cab . . . a black male dropped a handgun and the taxi driver [felt] he was going to be robbed, he was afraid." Tr. at 5. The taxi driver described the man as "[a] black male wearing a blue jacket" with a "black female with blonde hair." Tr. at 7. Officer Jason Palmer responded to the dispatch and was the first officer to arrive on the scene—the Studio Movie Grill. Because the taxi driver left before the police arrived, Officer Palmer called the driver directly to get more information. The driver "said the gun had fell [sic]," although Officer Palmer was not sure "if it was on the ground or in the taxi cab." Tr. at 6. And although the taxi driver reported "he was feared [sic] that he might be robbed," in fact "he wasn't actually robbed." Tr. at 12. And the driver made no claim the man had threatened him with the weapon. Tr. at 13.

As Officer Palmer proceeded inside the establishment Officer George Stewart arrived to assist. While speaking to security personnel, the officers observed "a black female with blonde hair walking away from a bench area" and then "observed a black male wearing a blue jeans [sic] and sweatshirt" seated on a bench in the area from which the woman had left. Tr. at 7, 8. The man was later identified as Thomas Pinner. The bench was next to a wall that was positioned behind Pinner. The officers approached the seated Pinner with Officer Palmer "standing on one side and Officer Stewart was standing on the other side[.]" Tr. at 15. Officer Palmer introduced himself and informed Pinner that they had received a call that "someone of [his] description . . . has a handgun on him." Tr. at 8. Officer Palmer then asked Pinner if he possessed a weapon. Pinner paused "for a few seconds" during which "he was kind of a little rocking back and forth [wringing] his hands." Tr. at 8. Although hesitant to answer, he denied having a weapon. Officer Palmer then instructed Pinner to "stand up and keep his hands up" where they could be seen; Tr. at 22, Pinner complied and Officer Palmer saw the butt of a gun in

Pinner's front pocket. Officer Palmer secured the weapon and detained Pinner for further investigation.

Pinner was arrested and charged with class A misdemeanor carrying a handgun without a license enhanced to a level 5 felony due to a prior felony conviction. He filed a motion to suppress, contending the search and seizure were conducted in violation of both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Following a hearing, the trial court denied the motion concluding the officers had reasonable suspicion to approach and question Pinner. App. at 45 (Order on Def.'s Mot. to Suppress Evid. at 3) ("The knowledge and facts known to this officer at the time of the stop was sufficiently particularized and objective to infer *possible* criminal activity or that criminal activity '*may be afoot*'. Court finds the initial detention amounted to reasonable suspicion and therefore was reasonable."). Pinner filed a Petition to Certify the Order for Interlocutory Appeal, which the trial court granted. The Court of Appeals accepted jurisdiction and, in a divided opinion, reversed the judgment of the trial court, concluding "no reasonable suspicion justified the investigatory stop. . . ." Pinner v. State, 59 N.E.3d 275, 276 (Ind. Ct. App. 2016). The State petitioned for transfer which this Court previously granted. Additional facts are set forth below.

**Standard of Review**

We review a trial court's denial of the Defendant's motion to suppress based upon a standard similar to that employed for other sufficiency of evidence issues. Litchfield v. State, 824 N.E.2d 356, 358 (Ind. 2005). Although "[w]e do not reweigh the evidence" and we generally "consider conflicting evidence most favorably to the trial court's ruling," id., the Court will consider "uncontradicted evidence to the contrary, to decide whether the evidence is sufficient to support the ruling." Holder v. State, 847 N.E.2d 930, 935 (Ind. 2006). Further, when an appellant's challenge to such a ruling is premised on a claimed constitutional violation, we review the issue de novo because it raises a question of law. Guilmette v. State, 14 N.E.3d 38, 40-41 (Ind. 2014).

3

**Discussion**

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable search and seizures."[1] Generally, to be reasonable, a search must be conducted pursuant to a properly-issued warrant supported by probable cause. Membres v. State, 889 N.E.2d 265, 275 (Ind. 2008). However, police may—without a warrant—stop an individual for investigatory purposes if, based upon specific, articulable facts, the officer has reasonable suspicion that criminal activity "may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968). Here Pinner contends the officers lacked reasonable suspicion that he was committing or was about to commit a crime to justify the investigatory stop. Specifically, he alleges the tip from the cab driver did not provide the officers with information sufficient to demonstrate he was engaged in or about to engage in criminal activity.

The State first responds that Pinner's initial encounter with the officers "did not implicate the Fourth Amendment because it was a consensual encounter." Br. of Appellee at 11. It is, of course, true that "[c]onsensual encounters in which a citizen voluntarily interacts with an officer do not compel Fourth Amendment analysis." Clark v. State, 994 N.E.2d 252, 261 (Ind. 2013). Indeed, "[a]s long as the person to whom questions are put remains free to disregard the questions and walk away," the encounter remains consensual. United States v. Mendenhall, 446 U.S. 544, 554 (1980).

At the time the officers approached, Pinner was seated alone on a bench with a wall behind him. Both officers were in full uniform and stood in front of him—one flanked on either side. Although nervous, Pinner made no furtive or suspicious movements, nor did he reach for the weapon; and he made no attempt to flee. The officers introduced themselves, immediately stated that they were searching for a man with a handgun, and asked whether Pinner was in

---

[1] Both the federal Fourth Amendment and Article 1, Section 11 of the Indiana Constitution protect citizens from unreasonable searches and seizures. In spite of the similarity in the structure of the federal and state constitutional provisions, interpretation and application vary between them. State v. Bulington, 802 N.E.2d 435, 438 (Ind. 2004). Here Pinner claims a violation of both the Indiana and federal constitutions. Because we conclude that the police action violated the Fourth Amendment, we do not address Pinner's claim under Article 1, Section 11.

4

possession of such a weapon. When Pinner answered negatively, Officer Palmer directed him to "stand up" and "keep his hands up high."[2] Tr. at 20, 21.

Assuming for the sake of argument that on these facts Pinner was "free to disregard the questions and walk away," Mendenhall, at 554, the encounter quickly shifted from a supposed consensual encounter to an investigative stop. See Clark, 994 N.E.2d at 263 (finding the encounter between police and defendant moved from a consensual encounter to a seizure when the officer "required the men to sit on the ground so he could respond more quickly to their movements—once he employed his authority to control and restrict their freedom to depart—the encounter moved past what would be considered 'consensual'"). And such a stop is permissible if, based upon specific, articulable facts, the officer has reasonable suspicion that criminal activity "may be afoot." Terry, 392 U.S. at 30.

At the time the officers ordered Pinner to stand, the information from the tip provided to them was as follows: (1) "[a] black male wearing a blue jacket[,]" Tr. at 7; (2) with a "black female with blonde hair[,]" Tr. at 7; (3) "dropped a handgun[,]" Tr. at 5; and "the taxi driver [felt] he was going to be robbed, he was afraid." Tr. at 5. We observe that "[e]ven a reliable tip will justify an investigative stop only if it creates reasonable suspicion that '*criminal activity* may be afoot.'" Navarette v. California, 572 U.S. ___ , ___, 134 S. Ct. 1683, 1690 (2014) (emphasis added) (quoting Terry, 392 U.S. at 30). Assuming without deciding the tip from the taxicab driver was reliable, the threshold question is whether the mere allegation that Pinner possessed a handgun—without more—is sufficient to establish that Pinner "[wa]s, or [wa]s about to be, engaged in criminal activity." Clark, 994 N.E.2d at 264 (citation omitted). And the criminal activity advanced by the State in this case is that "Defendant was carrying a handgun for which he had no license . . . or that some other criminal activity was afoot." Br. of Appellee at 18 (quotation omitted).

---

[2] There was conflicting evidence on the precise language Officer Palmer used. See, e.g., Tr. at 20-21 (Officer Stewart testifying that "in the police report I did say that [Officer Palmer] *told* him to stand up. . . . And also that he *told* him to keep his hands up high" (emphasis added)); accord App. at 13 (Aff. of Probable Cause at 1) ("Officer Palmer told the man to stand up and keep his hands held high; due to the possible presence of a firearm."). However, the trial court found that "Officer Palmer directed the Defendant to stand. The Defendant stood." App. at 44 (Order on Def.'s Mot. to Suppress Evid. at 2). We defer to the trial court on this point.

5

Recognizing the Second Amendment right to bear arms,[3] all states permit the exercise of this constitutional right under certain prescribed circumstances. Some jurisdictions have found that where an individual is reported as having visibly displayed a firearm in public contrary to state law, the requirement that the police have reasonable suspicion of criminal activity is satisfied.[4] But in instances where, as in this jurisdiction, possession of a weapon is not *per se* illegal, states are reluctant to permit a "firearm or weapons exception" to the constitutional limitations already imposed by Terry.[5]

These competing considerations were bought into focus in Florida v. J.L., 529 U.S. 266 (2000). In that case, police officers received an anonymous tip "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." Id. at 268. Upon arriving at the scene, officers observed a suspect—J.L.—matching the description. "One of the officers approached J.L., told him to put his hands up on the bus stop, frisked him, and seized a gun from J.L.'s pocket." Id. The trial court granted J.L.'s motion to suppress the weapon but that ruling was reversed by a Florida intermediate appellate court. But the Supreme Court of Florida quashed that decision and held the search invalid under the Fourth Amendment. Id. at 269 (citing J.L v. State, 727 So.2d 204 (1998)). In a unanimous opinion affirming the Florida high court the United States Supreme Court declared: "The question presented in this case is

---

[3] "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In like fashion, Article 1, Section 32 of our state constitution provides: "The people shall have a right to bear arms, for the defense of themselves and the State."

[4] See United States v. Rivas-Castro, 2017 WL 108025, at *2 (D.P.R. Jan. 11, 2017) ("The fact that [defendant] was visibly displaying the firearm, a crime pursuant to Puerto Rico law, satisfies the requirement that the reasonable suspicion must be of a 'criminal activity.'" (citations omitted)); United States v. Lacy, 2007 WL 314861, at *2 (C.D. Ill. Jan. 30, 2007) (finding reasonable suspicion to conduct an investigative stop and limited search based on a dispatch report of "a black man in a black outfit with a black cap . . . waving a gun around" where details of the description had been corroborated and "[officer] had a reasonable suspicion that criminal activity was afoot [because] [c]arrying a concealed weapon [wa]s a crime in Illinois" (citation omitted)).

[5] See, e.g., Commonwealth v. Gomes, 937 N.E.2d 13, 15 (Mass. 2010) ("There is no 'firearm exception' to the general rule barring investigatory stops and frisks on the sole basis of an anonymous tip." (citation omitted)); State v. Goree, 742 A.2d 1039, 1050 (N.J. Super. Ct. App. Div. 2000) ("declin[ing] to embrace a 'man with a gun exception' to the rule of individualized reasonable suspicion to 'stop and frisk'"); Commonwealth v. Hawkins, 692 A.2d 1068, 1070-71 (Pa. 1997) (explaining that "since there is no gun exception to the Terry requirement for reasonable suspicion of criminal activity, in the typical anonymous caller situation, the police will need an independent basis to establish the requisite reasonable suspicion").

whether an anonymous tip that a person is carrying a gun is, without more, sufficient to justify a police officer's stop and frisk of that person. We hold that it is not." Id. at 268. In reaching its conclusion the Court had this to say:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. *The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality*, not just in its tendency to identify a determinate person.

Id. at 272 (emphasis added) (citing 4 W. LaFave, Search and Seizure § 9.4(h), p. 213 (3d ed. 1996)). Further, in rejecting the State's contention that the threat posed by firearms warranted an exception to the reasonable suspicion requirement, the Court explained:

> Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions. Our decisions recognize the serious threat that armed criminals pose to public safety; Terry's rule, which permits protective police searches on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause, responds to this very concern. But *an automatic firearm exception to our established reliability analysis would rove too far*. Such an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun. Nor could one securely confine such an exception to allegations involving firearms. Several Courts of Appeals have held it *per se* foreseeable for people carrying significant amounts of illegal drugs to be carrying guns as well. If police officers may properly conduct Terry frisks on the basis of bare-boned tips about guns, it would be reasonable to maintain under the above-cited decisions that the police should similarly have discretion to frisk based on bare-boned tips about narcotics. As we clarified when we made indicia of reliability critical in Adams [v. Williams, 407 U.S. 143 (1972)] and [Alabama v. White, 496 U.S. 325 (1990)], the Fourth Amendment is not so easily satisfied.

Id. at 272-73 (emphasis added) (citations omitted).[6]

---

[6] Since J.L. was decided, federal courts addressing the issue have found the existence of reasonable suspicion for an investigatory stop where the facts support more than "bare-boned tips about guns" and there are independent factors to support an inference of criminality. See, e.g., Robinson v. Howes, 663 F.3d 819, 828, 830 (6th Cir. 2011) ("agree[ing] with the district court's determination that the 911 call and Petitioner's evasive conduct gave rise to reasonable suspicion that Petitioner was involved in a shooting, justifying an investigatory stop" and explaining, in part, that "unlike J.L., the call in this case did not simply report a man potentially carrying a gun but described shots being fired"); United States v.

7

In the case before us, the tip provided by the taxi driver made no "assertion of illegality," rather it merely had a "tendency to identify a determinate person" who was in possession of a handgun. J.L., 529 U.S. at 272 (citation omitted). Even taking his tip as true and assuming that Pinner was the man the taxi driver described, the officers had no reason to suspect that Pinner did not have a valid license to carry the handgun, an illegal act in this jurisdiction. This is not a case where, through independent investigation or personal experience, the officers had reason to believe that Pinner's possession of a weapon was in violation of Indiana law. In essence, other than the taxi driver's claims of being fearful because he had a seen an individual matching Pinner's description "drop a handgun" there is no evidence in the record from which an inference of *criminal* activity can be drawn. And a "bare-boned tip[] about guns" is insufficient.

The State contends that because Pinner "acted nervous" when being questioned the officers possessed additional facts to support reasonable suspicion. Br. of Appellee at 16. Even assuming that "rocking back and forth" and "wringing" one's hands is indicative of nervous behavior, Tr. at 8, the question is whether this behavior gave rise to reasonable suspicion of criminal activity. There is no crime in rocking back and forth and wringing one's hands. And Officer Palmer did not find these actions to suggest anything more than "nervous *maybe*, in [his] experience just you know uneasy with the question, *maybe* not you know telling the truth." Tr. at 9 (emphasis added). As this Court has explained, "nervousness is of limited significance when determining reasonable suspicion[.]" Finger v. State, 799 N.E.2d 528, 534 (Ind. 2003) (quotation omitted). We, like courts in other jurisdictions, have found this to be so because "it is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity." Id. (quoting United States v. Salzano, 158 F.3d 1107, 1113 (10th Cir. 1998) (internal quotation omitted)); see also State v. Lee, 658 N.W.2d 669, 678-79 (Neb. 2003) ("[N]ervousness, as a basis for reasonable suspicion, must be treated with caution . . . [because] it is common knowledge that most citizens

---

LePage, 477 F.3d 485, 488 (7th Cir. 2007) (concluding that J.L. did not require suppression of evidence based on a concerned citizen tip that described what the caller believed to be "an attempt to break into a car next to th[e] building" the defendant and others "had been circling," and "she believed that [defendant] was armed because he was carrying something in front of himself" where the police were able to corroborate some of the information provided by the caller and because "the officers knew [defendant's] criminal history, they could also have reasonably suspected that he was a felon in possession of a firearm").

whether innocent or guilty, when confronted by a law enforcement officer who asks them potentially incriminating questions are likely to exhibit some signs of nervousness." (internal quotations and alterations omitted)); accord Delaware v. Prouse, 440 U.S. 648, 657 (1979) (reasoning that "the physical and psychological intrusion visited upon the occupants of a vehicle by a random stop to check . . . may create substantial anxiety").

We also disagree with the State that "the officers were permitted under the Fourth Amendment to briefly detain Defendant to ascertain the legality of the weapon and dispel any suspected criminal activity." Br. of Appellee at 19. The United States Supreme Court has previously declared that law enforcement may not arbitrarily detain an individual to ensure compliance with licensing and registration laws without particularized facts supporting an inference of illegal conduct. See Prouse, 440 U.S. at 663 ("hold[ing] that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment"). In like fashion, we decline to endorse such behavior to ensure compliance with Indiana's gun licensing laws. This is precisely the type of "weapons or firearm exception" that other jurisdictions refuse to employ and the United States Supreme Court expressly disapproved of in J.L. See J.L., 529 U.S. at 272 ("Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions . . . [b]ut an automatic firearm exception to our established reliability analysis would rove too far."). "Were the individual subject to unfettered governmental intrusion every time he [exercised his right to bear arms], the security guaranteed by the Fourth Amendment would be seriously circumscribed." Prouse, 440 U.S. at 662-63. "This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." Id. at 661 (citations omitted). Once challenged, the State had the burden to show that under the totality of the circumstances the intrusion by police

was reasonable. Bannister v. State, 904 N.E.2d 1254, 1256 (Ind. 2009). Based on this record, we find that it has not.[7]

We hasten to add the officers in this case acted promptly and in the best interests of the community by responding to a tip involving someone who dropped a handgun in route to a public facility. In this regard, the officers properly exercised their authority to address the primary concern of ensuring public safety. We agree that police "ha[ve] a right, if not an obligation, to proceed to the location where [an] informant said they would find a man with a gun, even though this information may not provide the individualized suspicion required for a Terry 'stop and frisk.'" Goree, 742 A.2d at 1045 (citations omitted). But the proper exercise of authority does not determine the constitutionality of a suspect's detention or the propriety of the evidence seized. We are mindful, for example, that "the Fourth Amendment was intended to protect the citizen from the overzealous and unscrupulous officer as well as from those who are conscientious and truthful." White, 496 U.S. at 333 (Stevens, J., dissenting). At stake here is whether the evidence obtained by the conscientious officers in this case can be used against the Defendant without violating his Fourth Amendment rights. On the facts of this case, we find that it cannot.

## Conclusion

Upon de novo review we conclude the evidence was obtained in violation of the Fourth Amendment and thus the trial court erred in denying the Defendant's motion to suppress. We therefore reverse the judgment of the trial court and remand this cause for further proceedings.

Rush, C.J., and David, Massa and Slaughter, JJ., concur.

---

[7] We are equally unpersuaded by the State's contention that reasonable suspicion was present to suggest the weapon "may not have been possessed legally" because Pinner "failed to properly secure the firearm[.]" Br. of Appellee at 16. The State cites no authority in support of this proposition and we find none.