**[J-86-2018] [MO: Wecht, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 56 MAP 2017 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court dated March 29, 2017 at No. |
| | : | 510 EDA 2016 Affirming Judgment of |
| v. | : | Sentence from the Lehigh County |
| | : | Court of Common Pleas, Criminal |
| | : | Division, dated January 11, 2016 at |
| MICHAEL J. HICKS, | : | No. CP-39-CR-0005692-2014. |
| | : | |
| Appellant | : | ARGUED:  December 4, 2018 |

**CONCURRING OPINION**

**JUSTICE DOUGHERTY**                                    **DECIDED:  May 31, 2019**

Our legislature made nonlicensure an element of the crime of carrying a concealed firearm pursuant to 18 Pa.C.S. §6106.  *Commonwealth v. McNeil*, 337 A.2d 840, 843 (Pa. 1975).  It did not make licensure an affirmative defense to that crime.  It necessarily follows, then, that a police officer's knowledge an individual is carrying a concealed firearm in Pennsylvania, standing alone, does not establish reasonable suspicion justifying a *Terry*[1] stop to investigate a possible violation of Section 6106.  This is because mere knowledge of a concealed firearm does not give an officer reason to believe every element of the crime — including nonlicensure — has been met.  That analysis is sufficient to resolve this case.  Because the majority rejects this element-or-defense test in reaching its conclusion, I respectfully concur in the result only.

I.

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

We are not the first court tasked with deciding the issue presented in this case. The majority forthrightly recognizes this, as well as the fact that many of those other jurisdictions have analyzed the underlying Fourth Amendment question "based upon whether, under applicable statutes, nonlicensure is an **element** of the crime of carrying a firearm without a license — in which case a *Terry* stop for mere possession is unlawful — or whether licensure serves as an **affirmative defense** to the criminal charge — in which case a *Terry* stop is lawful." Majority Opinion, slip op. at 25-26 (emphasis in original). Ultimately, however, the majority concludes those decisions employing an element-or-defense approach are unpersuasive and "untenable, because [they] allow a manifestly unacceptable range of ordinary activity to, by itself, justify *Terry* stops." *Id.* at 27 (citation and quotation omitted). I cannot agree. As I explain below, I believe the element-or-defense test, which has been adopted by the overwhelming majority of jurisdictions that have considered this issue, is consistent with the Fourth Amendment; the authority the majority relies upon in support of rejecting the test is unconvincing; and the majority's alternative analysis will have profound consequences on law enforcement's ability to effectively investigate and prevent other crimes involving licensures.[2]

*A.*

As the majority admits, most courts that have considered Fourth Amendment seizures based solely upon the possession of a firearm have done so "with a particular eye toward the lawfulness of such activity under the statutes of the subject jurisdiction." Majority Opinion, slip op. at 24. Illustrative of this approach is the recent decision in *United States v. Pope*, 910 F.3d 413 (8th Cir. 2018). In *Pope*, the Eighth Circuit Court of Appeals considered whether an officer was entitled to stop an individual the officer reasonably

---

[2] Like the majority, I limit my discussion to the Fourth Amendment, as the issue presented "is one of law enforcement practice . . . not [ ] the right to keep and bear arms." Majority Opinion, slip op. at 7 n.5.

believed was carrying a concealed gun in Des Moines, Iowa. Recognizing that carrying a concealed weapon is a criminal offense under Iowa Code §724.4(1), and that possession of a concealed-carry permit is merely an affirmative defense to such a charge, the court held the officer had reasonable suspicion justifying the stop. *Pope,* 910 F.3d at 415-16. In reaching this conclusion, the court explained that under Iowa's statutory scheme, carrying a concealed weapon "is presumptively criminal until the suspect comes forward with a permit[.]" *Id.* at 416.

The Tenth Circuit Court of Appeals reached the same conclusion in *United States v. Rodriguez*, 739 F.3d 481 (10th Cir. 2013). Addressing Section 30-7-2 of the New Mexico Criminal Code, the court found the statute set forth a general criminal offense — carrying a concealed loaded firearm — but then excepted certain acts or classes of individuals from its scope, including those who possess a valid concealed handgun license. *Rodriguez*, 739 F.3d at 487. In other words, the court found that "carrying a concealed loaded handgun on or about one's person in New Mexico is presumptively unlawful[,]" and licensure is an exception to the offense. *Id.* at 487-88. This distinction was critical to the court's Fourth Amendment analysis, as it concluded the statutory exception operated as an affirmative defense to the charge, and thus it "need not bear upon an investigating officer's initial determination of reasonable suspicion where the exception's applicability would not be readily apparent to a prudent officer prior to the suspect's seizure." *Id.* at 488.

Many other federal and state courts have applied the element-or-defense test to discrete state statutes and concluded the presence of a concealed firearm gives rise to reasonable suspicion in those jurisdictions. *See, e.g.*, *United States v. Lewis*, 674 F.3d 1298, 1304 (11th Cir. 2012) (*Terry* stop justified where, under Florida law, "the possession of a valid permit for a concealed weapon is not related to the elements of the crime, but

rather is an affirmative defense"); *United States v. Gatlin*, 613 F.3d 374, 378 (3d Cir. 2010) (reasonable suspicion supported a seizure because, "under Delaware law, carrying a concealed handgun is a crime to which possessing a valid license is an affirmative defense, and an officer can presume a subject's possession is not lawful until proven otherwise"); *GeorgiaCarry.Org, Inc., v. Metropolitan Atlanta Rapid Transit Auth.*, No. 1:09-CV-594-TWT, 2009 WL 5033444, at *5 (N.D. Ga. Dec. 14, 2009) ("Because a Georgia firearms license is an affirmative defense to . . . the crime of carrying a concealed weapon, it does not matter if there was no reason to suspect [the defendant] did not have a Georgia firearms license."); *State v. Timberlake*, 744 N.W. 2d 390, 395, (Minn. 2008) (where permit to carry a pistol is an affirmative defense, "officers had a reasonable basis to suspect that [the defendant] was engaged in criminal activity, even without knowing whether he had a permit").[3]

These decisions highlight the importance state law plays in the Fourth Amendment analysis. *See generally* 1 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment*, §1.5(a) (5th ed. 2018) ("[S]ometimes how one comes out under the applicable Fourth Amendment standard will of necessity depend upon the contours of

---

[3] There is also a handful of jurisdictions that have concluded observation of a firearm — in some cases concealed, in other cases openly carried — does not establish reasonable suspicion. *See, e.g.*, *Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128 (6th Cir. 2015); *United States v. Black*, 707 F.3d 531 (4th Cir. 2013); *United States v. Ubiles*, 224 F.3d 213 (3d Cir. 2000); *United States v. King*, 990 F.2d 1552 (10th Cir. 1993). But as the Eighth Circuit astutely observed in *Pope*, *see* 910 F.3d at 415, these cases concerned conduct for which no license was required and was not otherwise criminal. *See Northrup*, 785 F.3d at 1132 ("[c]arrying a handgun out in the open is not an 'offense' in Ohio"); *Black*, 707 F.3d at 540 (it is "undisputed" that North Carolina "permit[s] its residents to openly carry firearms"); *Ubiles*, 224 F.3d at 218 ("the Virgin Islands legislature has not enacted a criminal statute prohibiting gun possession in a crowd or at a carnival"); *King*, 990 F.2d at 1555 ("[New Mexico] law permits motorists to carry loaded weapons, concealed or otherwise, in their vehicles"). Thus, while these cases are instructive with regard to the Fourth Amendment analysis applicable to nonlicensed or noncriminal conduct, such as openly carrying a firearm in Pennsylvania outside of Philadelphia, they have little bearing on the present matter.

state or local law."). After all, the legislature has "the exclusive power to pronounce which acts are crimes [and] to define crimes," *Commonwealth v. Church*, 522 A.2d 30, 35 (Pa. 1987), and it is the elements of those crimes that officers must consider when determining whether there is "reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000), *citing Terry*, 392 U.S. at 30.

Relatedly, within broad constitutional bounds, legislatures have flexibility "to reallocate burdens of proof by labeling as affirmative defenses at least some elements of the crimes now defined in their statutes." *Patterson v. New York*, 432 U.S. 197, 210 (1977); *see also Smith v. United States*, 568 U.S. 106, 110 (2013) (where an affirmative defense "excuses conduct that would otherwise be punishable, but does not controvert any elements of the offense itself, the Government has no constitutional duty to overcome the defense beyond a reasonable doubt") (citation and quotation omitted). While affirmative defenses typically only become relevant at trial, many courts have also recognized their Fourth Amendment implications. In this regard, courts are nearly unanimous in holding the potential applicability of an affirmative defense to a crime does not defeat reasonable suspicion or probable cause supporting an arrest, search, or seizure, except where the officer conclusively knows the affirmative defense applies. *See, e.g.*, *Painter v. Robertson*, 185 F.3d 557, 571 n.21 (6th Cir. 1999) (explaining affirmative defenses play a role in Fourth Amendment analysis only "where a reasonable police officer would conclusively know that an investigative target's behavior is protected by a legally cognizable affirmative defense[;]" in "all other cases, the merits of an alleged affirmative defense should be assessed by prosecutors and judges, not policemen"); *see also Baker v. McCollan*, 443 U.S. 137, 145-46 (1979) ("we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim

of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent").

In my view, the above discussion provides an adequate basis for concluding the element-or-defense test is constitutionally permissible under the Fourth Amendment. It also demonstrates the significant benefits conferred by the test: it respects legislative judgments about the structure of criminal offenses and burdens of proof, as well as avoids the perverse situation where the government has less to prove at a criminal trial than an investigating officer has a duty to consider during an investigation. *See Pope*, 910 F.3d at 416 ("we see no reason why the suspect's burden to produce a permit should be any different on the street than in the courtroom"); *Mackey v. State*, 83 So.3d 942, 947 (Fla. Dist. App. 2012) (to "require that a police officer not only have reasonable suspicion of criminal activity, but reasonable suspicion of the non-existence of an affirmative defense to the crime," would be "contrary to both precedent and common sense"); *cf. Adams v. WIliams*, 407 U.S. 143, 149 (1972) ("Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.").

*B.*

Presented with the opportunity to join the overwhelming and ever-growing tide of jurisdictions that have adopted the element-or-defense approach, the majority instead rejects them outright because it finds "much greater appeal" in two state court decisions that have not embraced the test: *Commonwealth v. Couture*, 552 N.E.2d 538 (Mass. 1990) and *Pinner v. State*, 74 N.E.3d 226 (Ind. 2017). Majority Opinion, slip op. at 27. In my respectful view, neither case is persuasive.

In *Couture*, a majority of the Supreme Judicial Court of Massachusetts concluded the "mere possession of a handgun was not sufficient to give rise to a reasonable

suspicion that the defendant was illegally carrying [a] gun[,]" even though licensure is an affirmative defense under Massachusetts law. 552 N.E.2d at 541. However, the court's discussion "is relatively conclusory, [and] little can be said about the underlying analysis." Royce de R. Barondes, *Conditioning Exercise of Firearms Rights On Unlimited Terry Stops*, 54 IDAHO L. REV. 297, 335 (2018). The decision in *Couture* also preceded all of the aforementioned cases adopting the element-or-defense approach, meaning the court did not have the benefit of considering the rationales laid out in those later decisions. Given *Couture*'s conclusory analysis and early adoption, I do not find it a convincing reason for straying from the test used by the majority of other jurisdictions.

Pinner holds even less value than *Couture*. While the majority apparently finds it "appealing" that the Indiana Supreme Court reached "an identical conclusion [as the court in *Couture*] with nary a mention of the element-or-defense approach[,]" Majority Opinion, slip op. at 27, I find nothing persuasive about *Pinner*'s failure to address, much less distinguish or reject, a compelling legal theory. Moreover, the court in *Pinner* "primarily treat[ed] the issue [as] having been resolved by [*Florida v. J.L.*, 529 U.S. 266 (2000)]." Barondes, *supra*, at 336. *See Pinner*, 74 N.E.3d at 233 ("This is precisely the type of 'weapons or firearm exception' that . . . the United States Supreme Court expressly disapproved of in *J.L.*"). Yet, the majority here concludes, and I certainly agree, that the *J.L.* Court's rejection of a proposed "firearm exception" was "grounded upon the reliability inquiries attending anonymous tips, not the distinct question of whether the mere possession of a firearm, however discerned, may establish a *per se* basis for an investigative detention." Majority Opinion, slip op. at 24. In essence, the majority endorses the result in *Pinner* while simultaneously rejecting the central premise of that court's rationale for reaching that result. This inconsistency undermines any force *Pinner* may have had.

The only other authority cited by the majority that could arguably support rejection of the element-or-defense test is *Delaware v. Prouse*, 440 U.S. 648 (1979). But *Prouse* proves no more persuasive a basis for rejecting the element-or-defense approach than *Couture* or *Pinner*. As the majority does, the defendant in *Rodriguez* viewed the question of whether an officer may conduct an investigative detention based solely on the presence of a concealed firearm as "analogous to the question of whether an officer can pull over any motor vehicle he chooses in order to determine whether the driver is properly licensed and in lawful possession of the car." 739 F.3d at 490 (citation omitted). The Tenth Circuit, joined by then-Judge, now-United States Supreme Court Justice Neil Gorsuch, roundly rejected this position:

> To be sure, any construction of a motor vehicle statute permitting such random stops, however the statute is worded, would be unconstitutional. In *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Supreme Court held the Fourth Amendment prohibits an officer from stopping a vehicle for the sole purpose of checking the driver's license and registration, where neither probable cause nor reasonable suspicion exists to believe the motorist is driving the vehicle contrary to the laws governing the operation of motor vehicles. *Id*. at 650, 663. The Court reasoned:

>> It seems common sense that the percentage of all drivers on the road who are driving without a license is very small and that the number of licensed drivers who will be stopped in order to find one unlicensed operator will be large indeed. The contribution to highway safety made by discretionary stops selected from among drivers generally will therefore be marginal at best.... In terms of actually discovering unlicensed drivers or deterring them from driving, the spot check does not appear sufficiently productive to qualify as a reasonable law enforcement practice under the Fourth Amendment.

> *Id*. at 659–60.

> Driving a car, however, is not like carrying a concealed handgun. Driving a vehicle is an open activity; concealing a handgun is a clandestine act. Because by definition an officer cannot see a properly concealed handgun, he cannot randomly stop those individuals carrying such weapon.

. . . Moreover, unlike the random stop of a motorist, we may safely assume the contribution to public safety made by the stop of an individual known to be carrying a concealed handgun will hardly be insignificant since "[c]oncealed weapons create an immediate and severe danger to the public." *Terry*, 392 U.S. at 31 (Harlan, J., concurring).

Randomly stopping a vehicle to check the driver's license and registration is more comparable to randomly stopping an individual **openly** carrying a handgun (which incidentally is lawful in New Mexico). The Supreme Court held the former unconstitutional. Whether the latter is constitutionally suspect is a question for another day. But where a police officer in New Mexico has personal knowledge that an individual is carrying a concealed handgun, the officer has reasonable suspicion that a violation of N.M. Stat. Ann. § 30–7–2(A) is occurring absent a readily apparent exception to subsection (A)'s prohibition. Accordingly, Officer Munoz's initial seizure of Defendant was "justified at its inception" and therefore passes Fourth Amendment scrutiny. *Terry*, 392 U.S. at 22.

*Rodriguez*, 739 F.3d at 490–91 (emphasis in original).

The Tenth Circuit's treatment of *Prouse* is compelling. Among other things, it refutes the majority's rationale the element-or-defense approach "allow[s] a manifestly unacceptable range of ordinary activity to, by itself, justify *Terry* stops." Majority Opinion, slip op. at 27. As the Tenth Circuit points out, that critique might be warranted if the issue were the random stopping of an individual openly carrying a handgun — an irrefutably legal and ordinary activity in Pennsylvania outside of Philadelphia. But since we are here considering the Fourth Amendment implications of an individual's concealed carrying of a firearm, rather than an openly carried firearm, *Prouse* neither controls this matter nor justifies the majority's refusal to embrace the element-or-defense approach.

*C.*

The majority's rejection of the element-or-defense approach not only puts our Fourth Amendment jurisprudence out of synch with the majority of the country, it also creates sweeping — though perhaps unintended — consequences for law enforcement's ability to effectively investigate and prevent other criminal activity involving licensures. One obvious example highlights the point.

As the majority correctly notes, no license is required in order to carry a firearm openly on one's person in Pennsylvania, except in Philadelphia. *See* Majority Opinion, slip op. at 9. "[I]t is no secret that the level of gun violence in Philadelphia is staggeringly disproportionate to any other area of Pennsylvania." *Commonwealth v. Scarborough*, 89 A.3d 679, 686 (Pa. Super. 2014), *appeal denied*, 102 A.3d 985 (Pa. 2014) (*per curiam*). Indeed, the Superior Court has recognized:

> The four years preceding the formation of the Philadelphia Gun Court were years of intense violence in Philadelphia: from 2000 to 2004, the city experienced more than 300 murders per year. *See Murders on rise in Philadelphia*, USA Today, December 12, 2005, available at http://usatoday.com/news/nation/2005-12-04-murders-philadelphia-x.htm. (last visited September 8, 2010). Philadelphia's murder rate in 2004, of 22.4 per 100,000 residents, was 'the highest of the nation's 10 largest cities and rank[ed] third among the 25 largest, behind Baltimore and Detroit.' *Id.* Eighty percent of the murders in Philadelphia were shooting deaths, ten percent higher than the national average.

*Id.* (citation omitted).

Recognizing this unfortunate reality, the legislature enacted 18 Pa.C.S. §6108, which "rationally addresses gun violence in Philadelphia." *Id.* at 686-87. By imposing a prohibition against openly carrying a firearm in Philadelphia without a license, the legislature sought to address the fact that, "as the most populated city in the Commonwealth with a correspondingly high crime rate, the possession of a weapon on a city street, particularly the brandishing of a weapon, can invoke a fearful reaction on behalf of the citizenry and the possibility of a dangerous response by law enforcement officers." *Id.* "[A] coordinate purpose [of Section 6108] is to aid in the efforts of law enforcement in the protection of the public[.]" *Id.* at 687.

As I see it, the inevitable effect of the analysis adopted by the majority — which does not take into account whether nonlicensure is an element of, or licensure a mere affirmative defense to, a crime — will be to frustrate the very purposes behind the

legislature's enactment of Section 6108. This is so because, by rejecting the element-or-defense test, the majority affords no deference to the legislature's construction of the crime. And if, as the majority concludes, a police officer cannot infer criminal activity merely from an individual's possession of a **concealed** firearm because it may be properly licensed, it logically follows that an officer cannot infer criminal activity merely from an individual's possession of an **openly carried** firearm in Philadelphia, because it too may be licensed. This result is untenable.

For decades, courts in this Commonwealth have held "an officer's observation of an individual carrying a handgun on public streets in the city of Philadelphia gives rise to probable cause for an arrest under §6108." *Commonwealth v. Taggart*, 997 A.2d 1189, 1196-97 (Pa. Super. 2010), *citing Commonwealth v. Romero*, 673 A.2d 374 (Pa. Super. 1996) and *Commonwealth v. Davis*, 614 A.2d 291 (Pa. Super. 1992). The construction of the crime's definition explains why this is the case. Unlike carrying a concealed firearm under Section 6106, for which the legislature made nonlicensure an element of the crime, the legislature took the exact opposite approach with regard to Section 6108, by making licensure an affirmative defense. *See Commonwealth v. Bigelow*, 399 A.2d 392, 396 (Pa. 1979) ("[T]he legislature must have intended that subsections (1) and (2) of [Section] 6108 be treated as setting forth defenses which, if they are to be raised at all, must be raised by the one charged with the offense."); *see id.* at 395 ("That the legislature intended the licensure issue in [S]ection 6106 cases to differ from the disposition of the same issue in [S]ection 6108 cases is borne out by the differing language employed in each section."). In short, by deeming licensure an affirmative defense to the crime of carrying a firearm

on the streets of Philadelphia, the legislature clearly intended "to aid in the efforts of law enforcement in the protection of the public[.]" *Scarborough*, 89 A.3d at 687.

In eschewing the element-or-defense approach, the majority renders irrelevant the purposeful distinction the legislature made between the crimes of carrying a concealed firearm and carrying a firearm on the streets of Philadelphia. Such decision, which rationally addresses gun violence in Philadelphia, was the legislature's alone to make, and it is entitled to deference from this Court. The element-or-defense approach would afford such deference; the majority's analysis does not.[4]

Not only does the majority's alternative analysis fail to attach any Fourth Amendment significance to the legislature's exclusive power to define crimes and

---

[4] Although I focus on the crime of carrying a firearm in Philadelphia to underscore the broader problems with the majority's rejection of the element-or-defense approach, there are undoubtedly other crimes involving licensures that will be similarly affected by the majority's analysis. For example, it has long been the law that "the odor of marijuana alone . . . is sufficient to support at least reasonable suspicion[.]" *In Interest of A.A.*, 195 A.3d 896, 904 (Pa. 2018) (citations omitted). The majority's analysis arguably casts doubt on that settled Fourth Amendment principle in light of the enactment of the Medical Marijuana Act, 35 P.S. §§10231.101-10231.2110, which makes it lawful for licensed patients to possess and use medical marijuana. Several other states, in upholding searches and seizures involving marijuana, have relied on the fact that legal marijuana use in those jurisdictions is merely an affirmative defense. *See, e.g., State v. Senna*, 79 A.3d 45, 49-50 (Vt. 2013) (since Vermont's medical marijuana law "exempts from prosecution a small number of individuals who comply with rigid requirements for possession or cultivation[,]" the possibility that someone might be immune from prosecution "does not negate the State's probable cause to search based in part on the odor of fresh marijuana"); *State v. Fry*, 228 P.3d 1, 5 (Wash. 2010) (probable cause to search existed notwithstanding a recognized "compassionate use defense" to marijuana charges in Washington; the law "only created a potential affirmative defense that would excuse the criminal act . . . [but it] does not, however, result in making the act of possessing and using marijuana noncriminal or negate any elements of the charged offense"). This Court has not yet had an opportunity to address the Fourth Amendment implications of Pennsylvania's authorization of medical marijuana use, but the majority's rejection of the element-or-defense approach here arguably forecloses our ability to conduct an analysis similar to that employed by our sister states in such cases.

affirmative defenses in this Commonwealth, it is also bound to create an unnecessary disparity between federal and state criminal prosecutions arising out of Philadelphia. As explained, the logical endpoint of the majority's refusal to adopt the element-or-defense approach will be the reversal of a long line of precedent holding an officer's observation of an openly carried firearm in Philadelphia justifies an investigative detention or even an arrest. Thus, under the majority's analysis, if an officer detains an individual based solely on his carrying a firearm in Philadelphia, the stop will be deemed unlawful for purposes of a state prosecution. Conversely, if that same prosecution were instead brought in federal court the stop will not be deemed unlawful, because the Third Circuit has adopted the element-or-defense approach, and it therefore recognizes our legislature's rational decision to make licensure an affirmative defense to a charge under Section 6108. *See, e.g.*, *United States v. Bond*, 173 Fed. Appx. 144, 146 (3d Cir. 2006) (because "possession of a license is an affirmative defense that can be raised by the defendant[,]" "a police officer has probable cause to arrest an individual for violation of [S]ection 6108 based solely on the officer's observation that the individual is in possession of a firearm on the streets of Philadelphia"). This absurd incongruity could and should be avoided.

II.

All of the above convinces me the element-or-defense approach presents the more sound analysis for dealing with crimes involving licensures. The majority of jurisdictions that have considered this issue have adopted the approach, and those few jurisdictions that have declined to do so fail to offer any persuasive rationale for following suit. There is also serious cause for concern over the majority's alternative analysis, which fails to afford any deference to the legislature's power to define crimes and affirmative defenses. At the very least, the majority's analysis calls into question swaths of Pennsylvania

precedent authorizing police conduct with respect to the investigation of certain other criminal activity involving licensures, including openly carrying firearms in Philadelphia and the possession and use of controlled substances.[5]

For these reasons, unlike the majority, I would adopt the element-or-defense approach. Applying that test here, the answer to the question presented is easy: because this Court has previously concluded "the absence of a license is an essential element of the crime" of carrying a concealed weapon under Section 6106, *see McNeil*, 337 A.2d at 843, an officer's knowledge an individual is carrying a concealed firearm cannot, standing alone, furnish reasonable suspicion justifying a *Terry* stop. As the majority opinion ultimately reaches this same conclusion, I concur in the result, but I must firmly distance myself from the majority's analysis and, in particular, its rejection of the element-or-defense test.

---

[5] The Majority does not deny these repercussions may likely follow from today's decision, but suggests such results are "preferable" to the consequences that will supposedly result from adopting the element-or-defense test. Majority Opinion, slip op. at 41. Specifically, the Majority fears the test will "transfer[ ] to the legislature the power to erase the protections of the Fourth Amendment[.]" *Id.* at 37. But "there are obviously constitutional limits beyond which the States may not go in this regard[,]" *Patterson*, 432 U.S. at 210, and because the judiciary is well equipped to make such determinations on a case-by-case basis, I see no reason to impose the unpliable rule the Majority does here based on an unfounded belief the legislature may seek to circumvent the Fourth Amendment in the future. I also find the Majority's reliance on 35 P.S. §780-113(a)(16) as an example of an "untenable consequence" of the element-or-defense test to be flawed. *Compare* Majority Opinion, slip op. at 40-41 (predicting unlimited seizures of individuals with medical prescriptions because the possession of a controlled substance statute has the "same statutory formulation" as the affirmative defense set forth at 18 Pa.C.S. §6108) *with Commonwealth v. Sojourner*, 408 A.2d 1108, 1113 (Pa. Super. 1979) (holding "'non-authorization' is an element of . . . Section 113(a)(16)" but nevertheless shifting the burden of production to the defendant because of policy concerns). In any event, adopting the element-or-defense test merely leaves the interpretation of statutes such as 35 P.S. §780-113(a)(16) for another day, when this Court can carefully consider whether the legislature intended for a given licensing requirement to operate as an affirmative defense and, if so, whether such allocation is constitutionally permissible. The Majority's analysis, in contrast, imposes an immediate and irrevocable consequence, by rendering all element-or-defense distinctions irrelevant for Fourth Amendment purposes.

Justice Mundy joins this concurring opinion.