## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision is not binding precedent for any court and may be cited only for persuasive value or to establish res judicata, collateral estoppel, or law of the case.



FILED

Oct 25 2023, 8:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Brian A. Karle
Ball Eggleston, PC
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Anthony Eugene Carter,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

October 25, 2023

Court of Appeals Case No.
23A-CR-394

Appeal from the Marion Superior Court

The Honorable Mark Stoner, Judge

The Honorable Andrew Borland, Magistrate

Trial Court Cause No.
49D32-2106-F2-18965

**Memorandum Decision by Judge Riley**
Judges Crone and Mathias concur.

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Anthony Eugene Carter (Carter), appeals his conviction for dealing in cocaine, a Level 2 felony, Ind. Code § 35-48-4-1(a)(2).

We affirm.

## ISSUE

Carter presents this court with one issue on appeal, which we restate as: Whether the warrantless search of Carter's purse violated his rights under Article 1, Section 11 of the Indiana Constitution.

## FACTS AND PROCEDURAL HISTORY

On June 19, 2021, around 11:00 p.m., Carter crashed while riding a motorcycle near the intersection of 30th Street and Arlington Street in Indianapolis, Indiana. Marion County Sheriff's Deputy Christian Schloegel (Deputy Schloegel) was the first to arrive on the scene. Carter was sitting in the street, had a large bump on his head, and was clutching a brown purse to his chest. Deputy Schloegel helped Carter move off the road into a grassy area. Indianapolis Metropolitan Police Officer Elizabeth Flatter (Officer Flatter) was next to arrive. She acquired Carter's driver's license for identification, and she further discovered that Carter's license was suspended and that he did not have an endorsement to ride a motorcycle. Officer Flatter decided not to arrest Carter at this time because he had extensive head injuries which necessitated medical attention.

[5] While Officer Flatter investigated Carter's license status, an ambulance arrived on the scene and Carter was placed inside, together with his brown purse. Outside, Officer Flatter noticed a broken bracelet near Carter's motorcycle. Believing that it belonged to Carter, Officer Flatter picked it up and walked to the ambulance to return it to Carter. After entering the ambulance, Officer Flatter asked if Carter wanted the bracelet, to which Carter "said yes and reached for it." (Transcript Vol. II, p. 100). Because the bracelet was broken and Carter was on the gurney, Officer Flatter suggested "to wrap it up inside [her] glove that way all the beads stayed together[.]" (Tr. Vol. II, p. 100). Officer Flatter offered to "drop it in the bag for him and he nodded his head as if that was okay." (Tr. Vol. II, p. 100). "The bag was already on the bench in the ambulance. It was already open. [Officer Flatter] didn't touch it." (Tr. Vol. II, p. 100). When Officer Flatter dropped the bracelet in the brown purse, she observed "what [she] recognized to be a firearm" inside the purse. (Tr. Vol. II, p. 60). Officer Flatter remained silent about the firearm at first because Carter was being treated for his injuries and she did not want him to react, as she needed to ask him questions about the crash.

[6] When Officer Flatter exited the ambulance, she requested to see the purse. She found the handgun in the purse and took possession of it because weapons are not allowed to be transported in an ambulance. In accordance with the Indianapolis Emergency Medical Services policy, "[p]atients shall not be allowed to retain a weapon in their possession during transport, this would include in a purse or bag within their reach. [] Any time a weapon is

encountered, it will be secured. Ideally, the weapon should be left at the residence or scene. If law enforcement is on the scene, they will be requested to assess the situation, and take the weapon into their possession." (Exh. Vol. I, p. 5). Accordingly, it is standard procedure when transported to the hospital in an ambulance to conduct a safety check of a patient's possessions and any weapons found must be collected and secured. The serial number is checked on all collected weapons prior to being placed in the property room for safekeeping until the patient is released from the hospital.

[7] Another officer on the scene checked the serial number on the handgun collected from Carter's purse and discovered that it had been reported stolen. Officer Flatter also discovered that Carter did not have a permit to carry a handgun.[1] Carter was placed under arrest. His purse was thoroughly searched, and officers discovered three cell phones and $328 in cash. Prior to leaving for the hospital, Officer William McMillian (Officer McMillian), who accompanied Carter to the hospital, smelled raw marijuana inside the ambulance.

[8] Once at the hospital, Carter was placed in the shock room, which is the room designated for patients who have suffered traumatic injuries. Patients are stripped down to their underwear in order to fully assess their injuries. Officer McMillian again smelled raw marijuana inside the shock room. While being

---

[1] Carter had been convicted of a felony within the previous fifteen years which prohibited him from carrying a firearm in general.

treated, Carter was protective of his underwear and swatted at the nurses. Seeing this, Officer McMillian believed Carter had marijuana in his underwear and decided to conduct a search. Officer McMillian recovered a black drawstring bag from Carter's underwear. Although Carter informed Officer McMillian that "it's just a little bit of weed," the bag contained twenty-three individually wrapped quantities of a white, powdery substance which the officer believed to be cocaine. (Tr. Vol. II, p. 123). Officer McMillian also recovered a second bag from Carter's underwear which contained marijuana. Subsequent testing revealed that the black drawstring bag contained 5.1917 grams of cocaine and that the second bag contained 18.87 grams of marijuana.

[9] On June 21, 2021, the State filed an Information, charging Carter with Count I, Level 2 felony dealing in cocaine; Count II, Class A misdemeanor carrying a handgun without a license; Count III, Class A misdemeanor driving while suspended; and Count IV, Class B misdemeanor possession of marijuana. On August 22, 2022, the State added Count V, Level 3 felony dealing in cocaine. On December 19, 2022, the State added Count VI, Level 2 felony dealing in cocaine. The following day, the State moved to dismiss Counts I, III, and IV, which was granted by the trial court.

[10] On November 9, 2022, Carter moved to suppress all evidence derived from the search as violating his rights under the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution. On November 16, 2022, the trial court conducted a hearing on Carter's motion to suppress and, after receiving evidence, denied Carter's motion. On December

21, 2022, the trial court conducted a bench trial. At trial, Carter objected to the admission of the handgun found in his purse. The trial court overruled Carter's objection and admitted the handgun into evidence. Carter also objected to the admission of the drugs retrieved from his underwear at the hospital. Again, the trial court overruled the objection and admitted the evidence. At the close of the evidence, the trial court found Carter guilty of Count II, Class A misdemeanor carrying a handgun without a license; Count V, Level 3 felony dealing in cocaine; and Count VI, Level 2 felony dealing in cocaine. On February 1, 2021, the trial court conducted a sentencing hearing. Due to double-jeopardy concerns, the trial court only sentenced Carter for Count VI, Level 2 felony dealing in cocaine, and imposed a sentence of twenty years, with thirteen years executed and seven years suspended.

[11] Carter now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

[12] Carter contends that the trial court abused its discretion by admitting the handgun into evidence because it was discovered pursuant to a warrantless search of his purse, which violated his rights under Article 1, Section 11 of the Indiana Constitution. Because Carter's case proceeded to trial where he renewed his objection to the admission of that evidence, his appeal is properly framed as a request to review the trial court's ruling on its admissibility. *Clark v. State,* 994 N.E.2d 252, 259 (Ind. 2013) ("Direct review of the denial of a motion to suppress is only proper when the defendant files an interlocutory appeal."). The trial court has broad discretion to rule on the admissibility of evidence. *Id.*

at 259-60. We review its rulings "for an abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights." *Id*. But when an appellant's challenge to such a ruling is predicated on an argument that impugns the constitutionality of the search or seizure of the evidence, it raises a question of law, and we consider that question *de novo*. *Kelly v. State*, 997 N.E.2d 1045, 1050 (Ind. 2013).

[13] Carter's handgun was discovered in "open view." *See Justice v. State,* 765 N.E.2d 161, 165 (Ind. Ct. App. 2002), *clarified on reh'g*, 767 N.E.2d 995 (Ind. Ct. App. 2002). The concept of "open view" is used in situations in which a law enforcement officer sees contraband from an area that is not constitutionally protected, but rather is in a place where the officer is lawfully entitled to be. *McAnalley v. State*, 134 N.E.3d 488, 500-01 (Ind. Ct. App. 2019). In such situations, anything that is within "open view" may be observed without having to obtain a search warrant because making such "open view" observations does not constitute a search in the constitutional sense. *Id*. However, the *Justice* court recognized that "in order to lawfully seize items in 'open view,' it may be necessary to obtain a search warrant or be able to justify a warrantless seizure under an exception to the warrant requirement." *Justice*, 765 N.E.2d at 165. In the cause before us, Carter's handgun was not discovered during a search of his purse but, rather, was observed by Officer Flatter in open view when she placed Carter's bracelet in his unzipped purse after receiving his consent to do so. After Officer Flatter discovered the weapon and exited the ambulance, she

requested to see the purse. She seized the weapon and took possession of it. Carter now contends that this seizure violated his rights pursuant to Article 1, Section 11 of the Indiana Constitution.

[14] Article 1, Section 11 of the Indiana Constitution reads:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

When analyzing Article 1, Section 11 of the Indiana Constitution, "[i]nstead of focusing on the defendant's reasonable expectation of privacy, we focus on the actions of the police officer and employ a totality-of-the-circumstances test to evaluate the reasonableness of the officer's actions." *Berry v. State*, 121 N.E.3d 633, 638 (Ind. Ct. App. 2019), *trans. denied*. *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005) establishes the test for the reasonableness of a search or seizure pursuant to Article 1, Section 11 of the Indiana Constitution and prescribes a balancing of three factors: 1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs. It is the State's burden to show its intrusion was reasonable. *State v. Bulington*, 802 N.E.2d 435, 438 (Ind. 2004).

[15] In evaluating the degree of suspicion, courts consider "the reasonableness of the officers' assumptions, suspicions, or beliefs based on the information available

to them at the time." *Berry*, 121 N.E.3d at 638. Here, Officer Flatter's suspicion was high. She had observed a handgun in Carter's purse when she placed his broken bracelet in the purse. She also was aware that Carter's license was suspended and that he did not have a motorcycle endorsement. Turning to the second *Litchfield* factor, we note that the degree of intrusion is evaluated from the defendant's point of view. *Id*. at 339. An "ordinary" pat-down of the outside of a suspect's clothing is a fairly limited intrusion for the purposes of the Indiana Constitution. *J.R. v. State*, 89 N.E.3d 408, 412 (Ind. Ct. App. 2017), *trans. granted, summarily aff'd in relevant part*, 100 N.E.3d 256 (Ind. 2018). We have also previously held that police are not required to wait until an individual appears to be reaching for a weapon in order to ensure his safety and the safety of the others at the scene. *Wilson v State*, 745 N.E.2d 789, 792 (Ind. 2001). We find that the degree of intrusion was low. Although a purse may contain personal items, Carter had not taken steps to hide the handgun from open view as the purse was sitting unattended, was unzipped, and the handgun was clearly visible without manipulating the bag or its contents. Lastly, the needs of law enforcement were high due to the Indianapolis Emergency Medical Services policy, which prohibits patients retaining a weapon in their possession during transport and which requires all weapons to be secured by law enforcement on the scene. Balancing the *Litchfield* factors and based on the totality of the circumstances, we conclude that Officer Flatter's seizure of the handgun was reasonable.

[16] Carter points to *Pinner v. State*, 74 N.E.3d 226 (Ind. 2017) and *Webster v. State*, 908 N.E.2d 289 (Ind. Ct. App. 2009) in support of his argument that the seizure of the handgun was unreasonable under Article 1, Section 11 of the Indiana Constitution. We find both cases to be unavailing to the cause at hand. In *Pinner*, our supreme court held that the evidence was obtained in violation of the Fourth Amendment of the United States Constitution when police officers detained the defendant after receiving a tip that he possessed a handgun in a taxi and then proceeded to enter a movie theater because the officers lacked reasonable suspicion that he was engaged in or about to be engaged in criminal activity. *Pinner*, 74 N.E.3d at 234. Unlike *Pinner*, Carter is proceeding under Article 1, Section 11 of the Indiana Constitution. Although its text mirrors the Fourth Amendment, we interpret Article 1, Section 11 of our Indiana Constitution separately and independently. *State v. Washington*, 898 N.E.2d 1200, 1205-06 (Ind. 2008).

[17] *Webster* too is factually distinguishable. In *Webster*, we held that the search of a purse and subsequent seizure of a handgun was unreasonable under the Indiana Constitution. *Webster*, 908 N.E.2d at 293-94. In that case, an officer conducted a traffic stop and Webster was a passenger in the vehicle. *Id*. at 290. Before the driver complied with the traffic stop, the driver allowed Webster to exit the vehicle with her purse and wait across the street near a gas station. *Id*. During the traffic stop, the driver could not find the vehicle's registration and the officer beckoned Webster in hopes that the registration was in her purse. *Id*. at 291. While Webster approached, the officer noticed a bulge in the bottom of her

purse and believed it to be a handgun. *Id*. When Webster reached into the purse to obtain her identification, the officer detained her and secured the purse. *Id*. Upon a search of the purse, the officer found a handgun. *Id.* Unlike in *Webster*, where the officer's generalized concern that Webster was carrying a handgun was based on mere speculation, here, the handgun was first observed by Officer Flatter in 'open view' in an unzipped purse and subsequently was seized pursuant to department policy prior to transporting Carter to the hospital.

[18] Based on the totality of the circumstances before us, we find the seizure of Carter's handgun to be reasonable, and we affirm the trial court's decision.[2]

## CONCLUSION

[19] Based on the foregoing, we hold that the trial court did not abuse its discretion by admitting Carter's handgun into evidence because the handgun's seizure did not violate his rights pursuant to Article 1, Section 11 of the Indiana Constitution.

[20] Affirmed.

Crone, J. and Mathias, J. concur

---

[2] Because we conclude that the seizure of Carter's handgun was reasonable under the Indiana Constitution, we do not address Carter's argument that the discovery of the illegal drugs in Carter's underwear should be suppressed as fruit of the poisonous tree.