FILED

Aug 11 2023, 8:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Talisha Griffin
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| **K.W.,** *Appellant-Respondent,* | August 11, 2023 |
| v. | Court of Appeals Case No. 22A-JV-3063 |
| | Appeal from the Marion Superior Court |
| **State of Indiana,** *Appellee-Petitioner* | The Honorable Ryan Gardener, Judge |
| | Trial Court Cause No. 49D10-2202-JD-001585 |

**Opinion by Judge May**
Chief Judge Altice and Judge Foley concur.

**May, Judge.**

[1]     K.W. appeals his adjudication as a delinquent child for committing an act that, if committed by an adult, would be Class A misdemeanor dangerous possession of a firearm.[1]  He presents multiple issues for our review, which we consolidate and restate as:

> 1.  Whether the trial court abused its discretion when it admitted the gun and magazine found on K.W. because Officer Khalid Brooks's investigatory stop and pat down of K.W. violated the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution; and

> 2.  Whether the trial court abused its discretion when it admitted the gun and magazine found on K.W. because the State did not establish a sufficient chain of custody.

We affirm.

## Facts and Procedural History

[2]     On February 27, 2022, the Lawrence Police Department responded to a 911 call reporting a domestic disturbance.  When Officer Brooks arrived on the scene, the woman who made the call advised Officer Brooks that her ex-boyfriend "had forced his way into her apartment . . . and assaulted her . . . [and] attempted to prevent her from calling 9-1-1[.]"  (Tr. Vol. II at 8.)  The woman told Officer Brooks that her ex-boyfriend's name was Steven Rodes and she had a protective order against him.  She described Rodes as a "heavy set

---

[1] Ind. Code § 35-47-4-6.5.

black male wearing black shirt and uh, or black hoodie and black jeans - or black uh, sweatpants." (*Id*. at 43-4.)

[3] Officer Brooks proceeded to canvas the area because he knew "the suspect had left on foot without a vehicle." (*Id*. at 44.) While canvassing, Officer Brooks observed a "black male matching the description that [he] was given[,]" (*id*.), who was later identified as K.W. Officer Brooks slowed his police vehicle, and after he passed K.W., he saw K.W. "abruptly cross the street behind [his] vehicle." (*Id*.) Officer Brooks lost sight of K.W. but then saw him in a nearby park, sitting at a picnic table in a gazebo.

[4] Officer Brooks parked his police vehicle, exited the vehicle, and began walking toward the gazebo. As he walked, he reported over his radio that he believed K.W. was Rodes because K.W. was a "black male, 5'11", heavy set, black hoodie, black sweatpants with white stripes on them[.]" (Ex. 1 at 23:39-23:45.) As he entered the gazebo, Officer Brooks yelled, "Steven?" (*Id*. at 23:47.) K.W., who was seated at the picnic table looking at his phone, did not respond. Officer Brooks again yelled, "Steven?" (*Id*. at 23:49.) K.W. again did not respond.

[5] Officer Brooks asked K.W., "What's your name?" (Ex. 1 at 23:50-:51.) K.W. responded[2] and Officer Brooks said, "You said it's [K.]?" (*Id*. at 23:52-:53.) Officer Brooks then asked K.W., "you got an ID on you or anything?" (*Id*. at

---

[2] K.W.'s response is not audible from Officer Brooks's bodycam.

23:55.) K.W. answered in the negative, and Officer Brooks told K.W. to "stand up will ya." (*Id.* at 23:56) (errors in original). Officer Brooks asked K.W., "You got any weapons on you?" (*Id.* at 23:57-8.) K.W. indicated he was carrying a weapon. Officer Brooks "positioned [himself] next to [K.W.], and told [K.W.] to turn around and I asked him where the weapon was, and [K.W.] motioned towards his um, hoodie – waist band area 'cause I was behind him at that point." (Tr. Vol. II at 47) (errors in original). Officer Brooks retrieved a gun and a magazine containing ammunition. Officer Brooks put K.W. under arrest and confirmed that he was not Rodes but instead was K.W.

[6] Based thereon, the State filed a petition alleging K.W. was a delinquent child for committing an act that, if committed by an adult, would be Class A misdemeanor dangerous possession of a firearm and Class A misdemeanor carrying a handgun without a license.[3] K.W. remained in his parents' care during the pendency of the proceedings. On November 2, 2022, K.W. filed a motion to suppress the gun and magazine found as part of his arrest. He argued Officer Brooks's stop of K.W. violated his rights against unreasonable search and seizure under the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution. On the same day K.W.

---

[3] Ind. Code § 35-47-2-1(e) (2017).

filed that motion, the trial court held a hearing on it, denied the motion, and proceeded to the fact-finding hearing.

[7] During the fact-finding hearing, Officer Brooks testified about the events leading up to K.W.'s arrest:

> [Officer Brooks:] Um, after seeing his behavior uh, reaction to the stimuli of my police car, my presence, and after contacting my partner, I went to the next intersection, made a U-turn, um, was hoping to see the suspect still walking up the street, just on the other side of the street. I didn't see him at all. So, I assumed the next closest place would be the park that he could be at. So, that's when I pulled into the um, parking lot and saw the suspect sitting under the gazebo.
>
> [State:] Um, and um, what did you do after you saw him at the gazebo?
>
> [Officer Brooks]: Uh, I let my partner know that I'm gonna try to make contact with the person- or the suspect matching the description given. Um, so I approached the suspect, asked him if his name was Steven who- which was the name of the suspect that I was looking for. Um, suspect responded with huh, and I repeated myself.
>
> [State:] Um, what happened after that?
>
> [Officer Brooks:] Uh, after he said no his name's [K.W.].
>
> * * * * *
>
> [State:] Um, so uh, after you had asked him his name what happened next?

[Officer Brooks:] So, I was approaching him um, I raised my voice to ask him what his name was- or ask him if he was Steven, and he said huh, and I'm still approaching him. I asked again and he said no and as I'm still getting roughly 10 foot away from him, knowing that I'm closing this distance between him and myself, that's when I asked if he had any weapons on him, due to the fact of he may be a suspect that's wanted for domestic battery, invasion of privacy, and that active warrant.

[State:] Okay. Um, so um, how did he respond to that?

[Officer Brooks:] He said yes, he does have a weapon on him[.]

(Tr. Vol. II at 45-6.) Officer Brooks testified he then searched K.W. and found a gun and a magazine. At the end of the fact-finding hearing, the trial court entered a true finding as to dangerous possession of a firearm, which would be a Class A misdemeanor if committed by an adult. On November 30, 2022, the trial court held the dispositional hearing and closed the case without ordering any services for K.W. or his family.

## Discussion and Decision

[8]     K.W. challenges the admission of the gun and magazine found on him.[4] He first contends Officer Brooks did not have reasonable suspicion to initiate a

---

[4] In his reply brief, K.W. argues the State on appeal used Officer Brooks's testimony from the pre-trial hearing on K.W.'s motion to suppress in error because, at the end of the pre-trial suppression hearing, the trial court denied the State's request to incorporate Officer Brooks's pre-trial testimony because some of it was hearsay. However, any error in the State's use of this testimony is harmless because Officer Brooks's testimony during K.W.'s fact-finding hearing was substantially the same as that presented at the pre-trial hearing on K.W.'s motion to suppress. *See Warren v. State*, 182 N.E.3d 925, 934 (Ind. Ct. App. 2022)

*Terry*[5] stop and thus the search violated his Fourth Amendment and Article 1, Section 11 rights. When these issues were argued as part of a motion to suppress and revived during trial, they are appropriately framed on appeal as challenges to the admission of evidence. *See Washington v. State*, 784 N.E.2d 584, 586-87 (Ind. Ct. App. 2003) (explaining issue is appropriately framed as challenge to admission of evidence at trial when defendant objected at trial and appeals from a completed trial, even though defendant filed a pre-trial motion to suppress). K.W. also argues the trial court abused its discretion when it admitted the gun found on K.W. because the State did not present sufficient evidence of the gun's chain of custody.

[9] Generally, we review a trial court's decision on the admission of evidence for an abuse of discretion. *Mack v. State*, 23 N.E.3d 742, 750 (Ind. Ct. App. 2014), *trans. denied*. "A trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before the court or if the court misapplies the law." *Id*. However, the constitutionality of a search or seizure is a matter of law that we review de novo. *Holloway v. State*, 69 N.E.3d 924, 929 (Ind. Ct. App. 2017), *trans. denied*. When making such a determination, we "consider the foundational evidence from the trial as well as the evidence from

_____

(holding officer's testimony that he initially believed brown substance found in defendant's house was heroin constituted harmless error because "we are satisfied that there is no substantial likelihood that the challenged evidence contributed to the jury's verdict").

[5] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1869 (1968).

the motion to suppress hearing which is not in direct conflict with the trial testimony." *Kelley v. State*, 825 N.E.2d 420, 427 (Ind. Ct. App. 2005).

## 1. *Terry* Stop

### 1.1 Fourth Amendment

K.W. argues Officer Brooks did not have reasonable suspicion to stop him and perform a pat down. The Fourth Amendment to the United Stated Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"The Amendment protects citizens from search or seizure absent a warrant supported by probable cause." *Tigner v. State*, 142 N.E.3d 1064, 1068 (Ind. Ct. App. 2020). However, there are several exceptions to the warrant requirement, and the State bears the burden of proving at trial that one of those exceptions applies before it may admit evidence collected during a warrantless seizure. *Id*.

One exception to the warrant requirement is the so-called *Terry* stop, which is "a brief investigatory stop falling short of traditional arrest." *Clark v. State*, 994 N.E.2d 252, 263 (Ind. 2013). Such a stop "permits an officer to stop and briefly detain a person for investigative purposes if the officer has reasonable suspicion supported by articulable facts that criminal activity may be afoot[,] even if the

officer lacks probable cause." *Id.* (internal quotation marks omitted). The reasonable suspicion requirement is satisfied when "the facts known to the officer, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has occurred or is about to occur." *Crabtree v. State*, 762 N.E.2d 241, 246 (Ind. Ct. App. 2002). It "entails something more than an inchoate and unparticularized suspicion or hunch but considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* "[A] set of individually innocent facts, when observed in conjunction, can be sufficient to create reasonable suspicion of criminal activity." *Finger v. State*, 799 N.E.2d 528, 534 (Ind. 2003). "What constitutes reasonable suspicion is determined on a case-by-case basis, and the totality of the circumstances is considered." *Polson v. State*, 49 N.E.3d 186, 190 (Ind. Ct. App. 2015). We must strike a balance between the interests of public safety and an individual's right to be free of arbitrary law enforcement interference. *Id.*

[12] Here, Officer Brooks walked toward K.W. in a park gazebo for two reasons. First, K.W. "abruptly cross[ed] the street" after seeing Officer Brooks's police car. (Tr. Vol. II at 44.) Second, K.W. matched the description of the suspect Officer Brooks was given, that is, a "black male, 5'11", heavy set, black hoodie, black sweatpants with white stripes on them[.]" (Ex. 1 at 23:39-23:45.) After he made initial contact with K.W., Officer Brooks conducted a pat down search of K.W. for officer safety because K.W. matched the general description of his

suspect, who had a warrant out for his arrest and allegedly had committed domestic battery, and because K.W. admitted being in possession of a weapon.

[13] In his brief, K.W. takes each individual part of Officer Brooks's proffered facts to support reasonable suspicion and attempts to argue each fact, standing alone, is not sufficient to prompt a *Terry* stop. First, regarding K.W.'s act of crossing the street when he saw Officer Brooks's car, K.W. argues, based on *Tumblin v. State*, 664 N.E.2d 783, 784 (Ind. Ct. App. 1996), that walking in a high crime area and turning around and walking in the opposite direction once one sees a police car does not create reasonable suspicion that criminal activity is afoot. However, in *Tumblin,* unlike here, those two factors – walking in a high crime area and turning away – were the only factors the officer used to justify his stop of Tumblin. Here K.W. not only crossed the street when he saw Officer Brooks's police vehicle, but he matched the general description of the suspect that police sought.

[14] Second, regarding Officer Brooks's testimony that K.W. matched the description of the suspect in the domestic violence investigation, K.W. argues, based on our holding in *Burkett v. State*, 736 N.E.2d 304, 307-8 (Ind. Ct. App. 2000), that Officer Brooks could not initiate an investigatory stop of K.W. because "a defendant's color of skin, which matches the suspect's, alone is not sufficient to establish reasonable suspicion of criminal activity justifying a *Terry* stop." (Br. of Appellant at 14) (formatting in original). However, Officer Brooks did not stop K.W. based solely on his skin color – K.W. was a heavy-set black male around 5'11" wearing a black sweatshirt and black sweatpants,

which fit the general description of the suspect for whom Officer Brooks was looking based on the victim's description of her attacker.[6] Thus, as our appellate courts have long held, Officer Brooks had reasonable suspicion to conduct a *Terry* stop. *See*, *e.g.*, *Johnson v. State*, 710 N.E.2d 925, 927-8 (Ind. Ct. App. 1999) (police had reasonable suspicion to stop Johnson because he fit the description of the suspect and was "within the perimeter which the police had established").

[15] Moreover, Officer Brooks had reasonable suspicion to search K.W. for weapons. As part of a valid *Terry* stop, an officer is also entitled to take reasonable steps to ensure his own safety. *Smith v. State*, 121 N.E.3d 669, 675 (Ind. Ct. App. 2019), *trans. denied*. This includes conducting "a limited search of the individual's outer clothing for weapons if the officer reasonably believes that the individual is armed and dangerous." *Patterson v. State*, 958 N.E.2d 478, 482-83 (Ind. Ct. App. 2011). Here, Officer Brooks testified K.W. matched Rodes's description, Rodes had an outstanding warrant, and Rodes allegedly had perpetrated a domestic battery. Further, when Officer Brooks, as part of the investigatory stop, asked K.W. if he had any weapons, K.W. answered in the affirmative.[7] Therefore, based on the totality of those circumstances, Officer

---

[6] K.W. contends he did not match the description of the suspect because he was not wearing a red, white, and blue Tommy Hilfiger jacket. However, as we consider only the facts most favorable to the trial court's decision, K.W.'s argument is an invitation for us to reweigh the evidence and judge the credibility of witnesses, which we will not do. *See Marcum v. State*, 843 N.E.2d 546, 547 (Ind. Ct. App. 2006) (appellate court will not reweigh evidence and considers conflicting evidence most favorable to the trial court's ruling).

[7] K.W. also argues his statement in the affirmative to Officer Brooks's inquiry regarding K.W.'s possession of a weapon violates K.W.'s Fifth Amendment right against self-incrimination. However, Fifth Amendment

Brooks had sufficient reasonable suspicion to search K.W. for weapons as part of the *Terry* stop.[8] *See*, *e.g.*, *Richey v. State*, 210 N.E.3d 329, 340 (Ind. Ct. App. 2023) (officer's pat down of Richey did not violate his Fourth Amendment rights because Richey disclosed he possessed a gun prior to the officer's search and thus "a search was necessary to ensure [the officer's] safety"), *reh'g denied*.

## 1.2 Article 1, Section 11 of the Indiana Constitution

[16]    While the language of Article 1, Section 11 of the Indiana Constitution mirrors the Fourth Amendment, we interpret Article 1, Section 11 independently. *Hardin v. State*, 148 N.E.3d 932, 941 (Ind. 2020), *cert. denied*, 141 S. Ct. 2468 (2021). Under the Indiana Constitution, we assess the reasonableness of a search or seizure by looking at the totality of the circumstances. *Id*. While other considerations may impact our analysis, we balance three factors when

---

rights are not implicated unless a suspect is subject to a custodial interrogation. *Crabtree*, 152 N.E.2d at 696. As we have held Officer Brooks discovered the weapon during a *Terry* stop, we need not consider K.W.'s argument regarding the Fifth Amendment.

[8] K.W. also argues Officer Brooks did not have probable cause to put K.W.'s arms behind his back before frisking him and doing so illegally detained K.W. He argues the stop should not have progressed that far because K.W. did not match the description of the suspect. However, as we have discussed multiple times in this opinion, Officer Brooks testified about why K.W. matched the suspect's description. As we consider only the facts most favorable to the trial court's decision, K.W.'s argument is an invitation for us to reweigh the evidence and judge the credibility of witnesses, which we will not do. *See Marcum*, 843 N.E.2d at 547 (appellate court will not reweigh evidence and considers conflicting evidence most favorable to the trial court's ruling).

Further, K.W. argues Officer Brooks did not have reasonable suspicion that K.W. had committed a crime based on our Indiana Supreme Court's decision in *Pinner v. State*, 74 N.E.3d 226, 231 (Ind. 2017). In *Pinner*, the informant did not indicate Pinner was engaged in any criminal activity outside of the possession of a firearm and thus our Indiana Supreme Court held stopping Pinner based on the suspicion that Pinner possessed a firearm, without more, violated the Fourth Amendment. *Id*. at 233-4. Here, there was not a tip that K.W. possessed a weapon. Instead, K.W. matched the description of a suspect for whom there was an active warrant and who may have been involved in a domestic battery incident. Thus, *Pinner* is not relevant.

examining the reasonableness of a search or seizure: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005).

[17] Regarding the first *Litchfield* factor, K.W. concedes "Officer Brooks had a high degree of suspicion that a violation occurred based on the report from the witness." (Br. of Appellant at 20.) However, K.W. contends that degree of suspicion as it related directly to K.W. was minimal because "he relied on the fact K.W. was black, crossed the street to go to the park, and was in the area he was investigating to conduct an investigatory stop." (*Id.*) K.W. misconstrues the facts. Officer Brooks did not stop K.W. because he was black – K.W. fit the general description of the suspect including general height, weight, race, and clothing.

[18] Second, while it is possible K.W. coincidentally crossed the street to go to the park at the same time Officer Brooks turned on the road, the facts most favorable to the trial court's decision are that K.W. crossed the street after he saw Officer Brooks in an effort to avoid Officer Brooks. As we consider only the facts most favorable to the trial court's decision, K.W.'s argument is an invitation for us to reweigh the evidence and judge the credibility of witnesses, which we will not do. *See Marcum*, 843 N.E.2d at 547 (appellate court will not reweigh evidence and considers conflicting evidence most favorable to the trial court's ruling).

[19]     To summarize as to the first *Litchfield* factor, Officer Brooks had a high degree of suspicion that prompted a pat down search. K.W. matched the description of the suspect for whom Officer Brooks was looking, who had an active warrant for his arrest, and who allegedly had committed domestic battery. Additionally, K.W. admitted he was carrying a gun. Thus, the first *Litchfield* factor weighs in the State's favor.

[20]     Regarding the second *Litchfield* factor, K.W. argues Officer Brooks's "intrusion on K.W.'s ordinary activities was high" because "K.W. was minding his own business, sitting under a gazebo at a park." (Br. of Appellant at 20.) However, Officer Brooks's initial query regarding K.W.'s name occurred some distance away from K.W., far enough away that Officer Brooks had to yell and some of K.W.'s answers are inaudible in Exhibit 1. As it pertains to the pat down search, Officer Brooks merely reached into the front pocket of K.W.'s sweatshirt where K.W. indicated he was storing a weapon. Therefore, we conclude Officer Brooks's level of intrusion was minimal. *See*, *e.g.*, *Moore v. State*, 49 N.E.3d 1095, 1103 (Ind. Ct. App. 2016) (officer's degree of intrusion was low when he asked defendant questions in a public place), *reh'g denied*, *trans. denied*. The second *Litchfield* factor weighs in the State's favor.

[21]     Finally, regarding the third *Litchfield* factor, K.W. concedes "[t]he extent of law enforcement needs in investigating the domestic disturbance was high." (Br. of Appellant at 20.) However, he argues Officer Brooks did not have reasonable suspicion to stop K.W. because K.W. did not fit the general description of the suspect. As we explained in an earlier part of the analysis, we consider only the

facts most favorable to the trial court's decision, and K.W.'s argument is an invitation for us to reweigh the evidence and judge the credibility of witnesses, which we will not do. *See Marcum*, 843 N.E.2d at 547 (appellate court will not reweigh evidence and considers conflicting evidence most favorable to the trial court's ruling).

[22] Because all of the *Litchfield* factors support the reasonableness of Officer Brooks's initial *Terry* stop and pat down of K.W., we conclude the stop did not violate K.W.'s rights under Article 1, Section 11 of the Indiana Constitution. *See State v. Crager*, 113 N.E.3d 657, 665 (Ind. Ct. App. 2018) (officer's degree of suspicion was high based on active arrest warrant, level of intrusion was "not high" because locked compartment in Crager's backpack was easily accessible and opened with a key, and extent of law enforcement needs were high because officer was concerned about his safety; thus, based on the totality of the circumstances, the search was lawful), *trans. denied*.

## 2. Chain of Custody

[23] K.W. argues the State did not present evidence of a proper chain of custody of the gun and magazine found on K.W. Our standard of review of chain of custody claims is well-settled:

> An adequate foundation establishing a continuous chain of custody is established if the State accounts for the evidence at each stage from its acquisition, to its testing, and to its introduction at trial. Under the chain of custody doctrine, an adequate foundation is laid when the continuous whereabouts of

an exhibit is shown from the time it came into the possession of the police.

> To establish a proper chain of custody, the State must give reasonable assurances that the evidence remained in an undisturbed condition. However, the State need not establish a perfect chain of custody, and once the State strongly suggests the exact whereabouts of the evidence, any gaps go to the weight of the evidence and not to admissibility. Moreover, there is a presumption of regularity in the handling of evidence by officers, and there is a presumption that officers exercise due care in handling their duties. To mount a successful challenge to the chain of custody, one must present evidence that does more than raise a mere possibility that the evidence may have been tampered with.

*Espinoza v. State*, 859 N.E.2d 375, 382 (Ind. Ct. App. 2006) (internal citations and quotations omitted). The extent of foundation the State must lay depends on whether the item to be admitted is fungible or nonfungible. *Dudley v. State*, 480 N.E.2d 881, 898 (Ind. 1985). "For fungible items, such as blood and drugs, an adequate foundation is laid when the whereabouts of an exhibit is shown from the time it came into the possession of the police." *Mateo v. State*, 981 N.E.2d 59, 66 (Ind. Ct. App. 2012), *trans. denied*. For fungible items, the State lays a proper foundation when "a witness is able to identify the item, . . . the item is relevant to the disposition of the case[,] . . . [and the State] provid[es] a reasonable assurance that the evidence was undisturbed as it passed from the custody of one person to the next." *Id*. at 66-7. "If the State presented evidence that strongly suggests the exact whereabouts of the evidence at all times, that is sufficient." *Id*. at 67. In contrast, for "nonfungible items like guns and vehicles,

the State need only show that the item is what it is purported to be and that it is in a substantially unchanged state" from when it was initially collected by police. *Id*.

[24] K.W. argues the State did not present evidence "that strongly suggests the exact whereabouts of [the gun] at all times." (Br. of Appellant at 36.) However, a gun is a nonfungible item, so the State is not required to prove the gun's exact whereabouts. *Mateo*, 981 N.E.2d at 67. At trial, the State offered the gun and magazine found on K.W. into evidence. Officer Brooks testified the items offered into evidence were

> the handgun itself um, the magazine, the bullets that were contained within the magazine, and a laser that- which I removed from the handgun because there [were] no identifiable serial numbers on the weapon as there are on most weapons with that um, model. So, I had to remove the laser at the bottom to try to find a serial number and there also was not one there.

(Tr. Vol. II at 49.) Officer Brooks also testified the gun was a "3D printed weapon." (*Id*. at 48.) Officer Brooks answered in the affirmative that the items "appear[ed] to be in the same or substantially similar condition as when [he] retrieved them." (*Id*. at 49.) Thus, the trial court did not abuse its discretion when it admitted the gun and magazine because the State presented evidence that those items were the same items Officer Brooks retrieved from K.W. on the day of the incident and they were in the same or substantially similar condition as they were on the day of the incident. *See Price v. State*, 619 N.E.2d 582, 583 (Ind. 1993) (trial court did not abuse its discretion when it admitted the gun

used to commit a murder because the officer who retrieved it testified it was the gun that was turned over to police at the time of the crime).

# Conclusion

[25] Officer Brooks's stop and subsequent pat down of K.W. did not violate K.W.'s rights against unreasonable search and seizure under the Fourth Amendment or Article 1, Section 11 of the Indiana Constitution. Additionally, the trial court did not abuse its discretion when it admitted the gun and magazine found on K.W. because Officer Brooks testified the items were the gun and magazine he retrieved from K.W. on the day of the incident and they were in the same or substantially similar condition as they were the day of the incident. Accordingly, we affirm the trial court's admission of the gun and magazine and its adjudication of K.W. as a delinquent child.

[26] Affirmed.

Altice, C.J., and Foley, J., concur.